## COMMONWEALTH v. JOSEPH FLEMING.

### APPEAL BY DEFENDANT FROM THE COURT OF QUARTER SESSIONS OF MERCER COUNTY.

Argued October 15, 1889—Decided November 4, 1889.

[To be reported.]

1. The meaning of the term C. O. D., placed upon an express package, is that the carrier is directed to collect the price of the goods at the time of delivering them to the consignee, and to withhold such delivery until payment thereof is made; and is authorized on receipt of such payment to discharge the purchaser of the goods from liability for their price.

2. When, in pursuance of an order for goods, directed by the purchaser to be shipped to him C. O. D., the vendor has delivered them to a common carrier, with instructions to collect their price from the consignee before delivering them to him, the transaction as a sale is complete, so far as the vendor is concerned.

3. In such case, while the title to the goods does not pass to the purchaser if they be not delivered to him by the carrier, that circumstance does not affect the character of the transaction as a completed contract of sale; the seller's right to recover the price, if the purchaser refuse to take the goods, is as complete as if he had taken them without payment.

4. An order from a seller to a carrier to collect on delivery is a mere provision for retention of the seller's lien; if accepted it creates a contract between the seller and the carrier, on breach of which by the latter, the seller may recover the price from him; but it does not make payment by the vendee a condition precedent to delivery, so that the seller may reclaim goods delivered by the carrier without payment.

5. If a liquor dealer in Allegheny county receive an order for liquor, to be shipped to the purchaser in Mercer county, C. O. D., and in pursuance of the order the liquor be delivered to a common carrier in Allegheny county, for transportation to the vendee, at the latter's expense, C. O. D., the delivery to the carrier is a delivery to the purchaser in such a sense as to complete the sale in Allegheny county.

6. In such case, the vendor cannot be convicted of selling liquor without license in Mercer county, merely because the price is collected therein from the purchaser in pursuance of the instructions given to the carrier, as the essential acts which constitute the sale, within the meaning of that term as used in the act prohibiting the sale of liquor without license, take place in Allegheny county.

7. Even if, to conserve the vendor's lien, a technical inference that the title does not pass and the sale is not complete until payment would be justified, it does not follow that such an inference can be used to clothe

the transaction with a criminal character; a criminal statute must be construed strictly and applied to such acts only as are plainly within its meaning, according to the common understanding of men.

Before Paxson, C. J., Sterrett, Green, Clark, Williams, McCollum and Mitchell, JJ.

No. 60 October Term 1889, Sup. Ct.; court below, No. 34 January Term 1889, Q. S.

At January Term 1889, the grand jury returned as a true bill an indictment, based upon a constable's return and charging that on January 5, 1889, at the county, etc., Joseph Fleming " did unlawfully sell and cause to be sold vinous, spirituous, malt and brewed liquors, and admixtures thereof, without having first then and there obtained a license agreeably to law for that purpose," contrary, etc. The defendant, having been arrested and brought into court, pleaded not guilty.

At the trial of this indictment, on January 17, 1889, the commonwealth called as a witness William Fox, who was sworn, and counsel stated that they proposed to prove by the witness that he was a resident of Mercer county; that within six months last past he had ordered whiskey from the defendant; that the same was sent to him from Pittsburgh by express C. O. D., to Mercer, Mercer county, Pa.; that he received the same from the express office, and paid the express agent the amount marked upon the package for collection; to be followed by the testimony of other witnesses to substantially the same facts.

This was objected to by the defendant, first, because the offer did not propose to show that the defendant maintained in Mercer county a place for the sale of intoxicating liquors, or that he was engaged in the sale of intoxicating liquors in Mercer county, or that he sold intoxicating liquors in Mercer county; secondly, because the offer was incompetent and irrelevant generally.

By the court: Objection overruled; exception.[1]

The witness thereupon testified that he resided in the borough of Mercer; that about a month before, he had ordered, by a letter addressed to the defendant at No. 84 Market street, Pittsburgh, two quarts of Guckenheimer whiskey, directing it to be sent to Mercer, C. O. D.; that two or three days after

Statement of Facts.

writing the letter, the witness received the liquor by Adams Express, and paid to the express agent the amount of the charges on it, $2.45; that in July, 1888, the witness got from the defendant in the same way three or four bottles of wine; that in each of these instances the box containing the liquor had on it the letters " C. O. D.," the amount of the defendant's charges in dollars and cents, and the word " glass; " that the witness got the · address of the defendant by seeing it in the papers, the Pittsburgh papers, he thought; that he believed he had seen it once in the Western Press, published at Mercer, though he was not certain about this. On cross-examination the witness testified that he had never seen the defendant in Mercer; that the defendant never solicited orders from the witness; that, upon receiving the liquors from the express agent, the witness paid him the freight and return charges, as well as the price of the liquors.

The commonwealth then called Conrad Hays, Harry Ford, and Andy Thompson, each of whom testified that he had ordered whiskey, in quantities of six bottles, by letters sent to the defendant at Pittsburgh, directing that the liquor be sent to Mercer, C. O. D., and had there received it through the Adams Express Company, paying its price to the express company's agent at Mercer, the packages having been sent C. O. D. as ordered. Each of these witnesses testified also that no person solicited from him the orders so sent; that upon receiving the whiskey from the express company he had paid the express and return charges; and that the liquor was shipped in boxes marked " glass." Thompson testified that he had learned the price of the whiskey from a newspaper advertisement, but whether it was in a Mercer paper or not, he did not recollect.

The commonwealth then called as a witness J. K. Lindsey, and proposed to prove by him that he was the agent of the Adams Express Company at Mercer, Pa.; that during the twelve months last past there had been sent through the Adams Express Company packages from Joseph Fleming, of Pittsburgh, to Harry Ford, Frank Neuroh, William Fox and others; that the C. O. D. prices marked on the said packages were paid to him as the agent of the Adams Express Company, and remitted by him to the express agent at Pittsburgh, as collections made by him at Mercer for Joseph Fleming, of Pittsburgh.

Objected to as incompetent and irrelevant.

By the court: Objection overruled; testimony as to the frequency with which packages of the kind described were sent C. O. D., would be competent as tending to show knowledge on the part of the defendant of such sending; exception.[2]

The witness thereupon testified that during the past year there had passed through the office of the Adams Express Company, at Mercer, packages sent C. O. D. from Pittsburgh by Joseph Fleming to Harry Ford, Conrad Hays, Andy Thompson and William Fox, respectively; that the letters C. O. D. on an express package meant that the express company should collect, upon delivering the package to the consignee, its value or price as stated in the accompanying invoice; that in each of the instances referred to the witness collected from the consignee the amount of the invoice and remitted the same to the defendant, and also collected at the same time from the consignee the express company's charges for carrying the package to Mercer and for forwarding to Pittsburgh the money collected for the defendant; that the word " glass " was usually marked with a stencil plate on the outside of the packages mentioned by the witness; that in the invoice accompanying a package shipped by the defendant to Harry Ford and received at Mercer on January 2, 1889, the goods sent were designated as " one box medicine ; " that the witness did not know of his own knowledge what the contents of any of the packages he had spoken of were.

The commonwealth called Thomas McLain, and proposed to prove by him that he was the publisher of the Western Press, published in Mercer, Pa.; that a gentleman representing himself as the agent of Joseph Fleming, of Pittsburgh, made a contract with him, acting for the Western Press, to insert an advertisement offering to sell whiskey and fill all orders C. O. D. or otherwise, and that Joseph Fleming paid for said advertisement, which was signed " Joseph Fleming, 84 Market street, Pittsburgh, Pa."

Objected to as incompetent and irrelevant.

By the court: Objection overruled; exception.[3]

This witness testified that he was one of the publishers of the Western Press, a newspaper published at Mercer; that an advertisement which he identified was published in said paper

from some time in the previous summer to. the date of the trial, the intention being that it should appear every week unless crowded out by other matter; that the witness made a contract with the defendant for the amount to be paid for it.

The commonwealth offered in evidence the advertisement identified by Thomas McLain. Objected to.

By the court: Objection overruled; exception.[4]

Of this advertisement the following is a copy: "We ask your kind indulgence just for one moment. When you want a good pure whiskey, let no explanation or solicitation induce you to take or buy any other than the pure eight-year-old export Guckenheimer, sold only by Joseph Fleming, 84 Market street, in full quart bottles, at one dollar a bottle, or six for $5. No other whiskey now on sale anywhere that will compare with it. All mail orders, C. O. D. or otherwise, promptly attended to. Please write shipping directions plain. Remember house and number. Joseph Fleming, 84 Market Street, Pittsburgh Pa." The commonwealth here rested.

Joseph Fleming, the defendant, testified in his own behalf that he resided at Sewickley in Allegheny county, and carried on at No. 84 Market street, Pittsburgh, the business of a wholesale and retail druggist and a wholesale liquor dealer, having in his store ten employees; that he had been engaged in this business as a proprietor since 1855; that the witness had no personal knowledge of the filling of any of the orders for liquor mentioned by the witnesses for the commonwealth; that the business of the witness was entrusted chiefly to his son George and two other clerks; that mail matter coming to the store would be first opened by George, and he would enter any orders and then hand the book to the shipper, who would take charge of it and attend to shipping the goods ordered:

Q. Did you ever knowingly sell any liquor in the county of Mercer?

Objected to as incompetent and irrelevant.

By the court: Objection sustained; the question of a sale of liquor in Mercer county is one of law as well as of fact; the witness may state the facts as to the transactions testified to by the witnesses on behalf of the commonwealth, but it is for the jury, under the instructions of the court, to determine whether or not they constituted sales; exception.[5]

The cross-examination of the defendant was as follows:

Q. [Card shown witness.] Is that one of your advertisements? A. Yes, sir. Q. How long is it since that advertisement was first issued and circulated? A. Well, I don't know whether that particular one—Q. One just like that? A. Similar to it? Q. Similar to it. A. Well, I presume we have been advertising for five years. Q. On a card similar to this? A. Well, that is a new card. We change the cards every year. Q. You have seen a card just exactly like this? A. Certainly; yes, sir. Q. For the past three or four or five months? A. Yes, sir. Q. And of course you knew the contents of this card. A. Certainly. Q. You do not know how this card got to Mercer, I suppose? A. I think perhaps it came through Remington Brothers. They do our advertising. Q. Remington Brothers, of Pittsburgh? A. Yes, sir; they are newspaper dealers, and they make contracts. Q. You have a contract with them to do your advertising and circulate your cards and your advertisements? A. Yes, sir. Q. [Newspaper shown witness.] There is the Sharpsville Advertiser, published in this county. Will you please look at that and see if that is an advertisement of your house? A. Yes, sir. Q. Do you know how long that has been in the Sharpsville Advertiser? A. No, I do not. The contracts are generally made by the Remingtons as agents. I know very little about it, except that they do the advertising. Q. They do the advertising, and you pay them? A. Yes, sir; occasionally a young man who distributes circulars at the fairs would make contracts with papers, and I don't know what ones he has made contracts with; but generally the Remingtons are the ones who make them. Q. Who furnishes the form of the advertisement? A. Mr. Cool. Q. That is a gentleman in your house? A. That is the one who distributes the circulars. Q. Is he authorized by you to do that? A. Yes, sir. Q. And to distribute at the fairs? A. Yes, I stated that he is the one who distributes them at the fairs. Q. Well, is that part of his business? A. Yes, sir. Q. In your house? A. Yes, sir; it was. Q. To distribute your advertisements at fairs? A. At fairs. He begins at Westmoreland, and comes on down to Mercer county. Q. He was in your employ for that purpose? A. Yes. Q. You do not know, then, whether this card was

sent out by Remingtons, or by Mr. Cool? A. By Mr. Cool, that card was. But the advertisements were mostly by the Remingtons. Q. Do you know of Mr. Cool being in our town at the last agricultural fair, last September? A. Yes, sir; I knew he was here. Q. Did you know that he was distributing these cards? A. Yes, sir; at the fair I did. Q. Then, as I understand you, the clerks in your employ had authority by these advertisements to send goods C. O. D.? A. Yes, sir; my clerks had. Q. They had that general authority under these advertisements? A. Yes, sir. Q. And when you say that you did not ship any goods to Harry Ford or to these other persons, you mean that you did not do it personally? A. Personally; that is it. You see I live in the country about fifteen miles, and I don't get to the city until about ten o'clock, and when I get there the mail is all opened and the work distributed. Q. The business of one of your clerks is to open the mail and put the orders on an order book? A. Yes, sir. Q. And then the shipping clerk takes that order book and fills the orders? A. Yes, sir. Q. And delivers to the express company? A. Yes, sir; the express company come to the store and take them away. Q. You hang a card out? A. No, they come every day. They come perhaps three or four times a day to carry packages away. Q. Then you know of your own knowledge that your clerks were shipping goods C. O. D.? A. Certainly; yes, sir. Q. That they were shipping this Guckenheimer whiskey C. O. D.? A. Yes, sir.

The defendant put in evidence a license issued from the Court of Quarter Sessions of Allegheny county, authorizing Joseph Fleming & Son to sell vinous, spirituous, malt or brewed liquors, at wholesale, for the space of one year from May 1, A. D. 1888; also a United States license to the same firm. Thereupon the defendant rested.

In rebuttal the commonwealth offered in evidence the advertisement published in the Sharpsville Advertiser and identified by the defendant; also the advertising card identified by the defendant in his testimony.

Objected to as incompetent, irrelevant, and as being part of the commonwealth's case in chief.

By the court: Objection overruled; exception.[6]

Copies of this advertisement and card were not printed in the paper-books.

Charge of Court below.

At the conclusion of the testimony the court, M̧EHARD, P. J., charged the jury as follows:

The defendant in this case is charged with having sold liquors of an intoxicating kind within the limits of Mercer county without a license. The facts in the case are not seriously disputed. It seems that certain residents of the borough of Mercer have from time to time within the past year ordered liquor from the defendant to be sent to them C. O. D.; that in response to their letters containing these orders the liquor has been shipped from the business house of the defendant to the express office in the borough of Mercer, and that there the persons ordering and to whom the liquor was sent have received it, paying for it at the time. There is a denial on the part of the defendant that he had any personal knowledge of these transactions. He has detailed to you how the business of his establishment is conducted; that letters containing orders are delivered to his son, who is one of his chief employees, and that then the order is put in the order book, and it is put in process of shipment, and finally is shipped, according to their ordinary course of business. It is in evidence, and is not in dispute at all, that the defendant has caused advertisement to be made in the county of Mercer soliciting orders for intoxicating liquor, and stating that he would fill them, if requested, C. O. D., as it is termed. . . . .

As has been said, it does not seem to be denied or disputed that certain persons within the borough of Mercer ordered or requested Joseph Fleming to send intoxicating liquors to them C. O. D., and that the intoxicating liquors were sent in response to their request. The express agent has been called, and he has testified to you as to the meaning of the expression "C. O. D." He says that it means that the price of the invoice of the goods shall be collected on the delivery of the goods; to collect on delivery, in other words. It is incumbent upon the court to state to you what is the meaning of a contract, when the elements of the contract are determined; and we say to you, gentlemen of the jury, that if you find that a person within the borough of Mercer sent to Joseph Fleming a request to send to him intoxicating liquor, the price of it to be collected on the delivery of the goods, and that Joseph Fleming, in response to that, did send liquor to the borough of Mercer, specifying that

the price was to be collected on the delivery of the goods, the meaning of that contract was that the price was to be paid when the goods were delivered, or before the goods should be delivered, and that this specification was a part of the contract, and that it would be one of the conditions of the contract; and it would be a condition precedent, or at least concurrent, upon which the right of the purchaser to receive the goods would depend. He would have no right to receive the goods until the price was paid.

The place where the delivery would be made would be a question of fact to be determined by the circumstances of the case. If the party ordered the liquor from Mercer in such words as implied that it was to be sent to him at Mercer, and if, in consequence of that request, Joseph Fleming shipped the liquor to Mercer and attached the condition to collect on delivery, you would be warranted in inferring that it was understood between the parties that the goods were to be delivered in Mercer, and that that would be the place where the money was collected and the goods were to be delivered.

The underlying question in this case is as to the place where the sale took place. Where did Joseph Fleming sell these intoxicating liquors? Was it in the city of Pittsburgh, at his place of business on Market street, or was it in the county of Mercer? A sale is the transmutation of title. [A sale of intoxicating liquors means that the absolute title to the goods is transferred from one man to another, and the place of the sale is the place where the absolute title is transferred from one man to another. Now, if that be true, and if it be true that Joseph Fleming, either of his own volition or by the previously given consent of the other party, established it as one of the conditions of the sale of these liquors that the price was to be paid on delivery, and he sent those goods to be delivered in Mercer, and the price to be there collected, that would be the place where the absolute title of the goods would be changed from Joseph Fleming to the purchaser. In other words, until the price was paid the title would remain in Joseph Fleming; and if that change of possession and payment of price took place within the limits of Mercer county, the sale took place within the limits of Mercer county.] [7]

Now, gentlemen of the jury, this is a decision of the legal

proposition in this case. But it has been earnestly and ably argued by the counsel for the defence that the law is not so, and the line of argument has been indeed plausible, and it has been presented with great force; but we are not convinced that the theory contended for by the learned counsel for the defendant is the correct theory. The general propositions laid down by the counsel are correct, but they do not, in our opinion, cover this case. It is true that when one orders goods from a merchant at a distance, to be shipped to him, and the merchant places those goods in the care of a common carrier, such as an express company or a railroad company, to be carried to the person ordering the goods, the title to the goods passes the moment they are placed in the hands of the common carrier. [It is not the law that the title remains in the vendor until the goods reach their destination; but it is the law that ordinarily the title to the goods passes when they are placed in the possession and care of the common carrier. But that does not cover a case where the payment of the price is made a condition precedent to or concurrent with a delivery of the goods. If that is a part of the contract, then the title does not pass until after the goods have been paid for and delivered.][8]

I will not undertake to review the numerous authorities which have been cited by the learned counsel for the defendant, but I will direct attention briefly to one or two of them. And first, as to the case that has been read, not only to the court, but commented upon to you, gentlemen of the jury; Higgins *v.* Murray, 73 N. Y. 252. The facts of that case were these: On or about April 27, 1873, the defendant requested the plaintiff to manufacture for him a set of circus tents of a specified kind and dimensions, which the plaintiff undertook to do in three weeks. In pursuance of said order, the plaintiff manufactured the tents, and had them completed about the 21st day of May. On July 29, 1873, the defendant, by letter, directed the said tents to be shipped to him at Bath, Me., by freight or boat or car. Thereafter the defendant, by letter, directed the plaintiff to ship them to Lewiston, Me. Pursuant to such direction, the plaintiff shipped said tents to the defendant at Lewiston, and took a bill of lading, subject to cash on delivery of $1,395, the price of the tents. The defendant was to pay the freight. The tents never reached the defendant at Lewiston, but were

consumed by fire at Portland, Me. They were forwarded by steamer to Portland, directed to defendant at Lewiston. Now, the point of difference, gentlemen, between that case and this, as we conceive it to be, is, that the contract as made by the parties did not make the payment of the price a condition of the sale. The contract was that the defendant was to make the plaintiff a set of circus tents of a specified kind and dimensions, and this the plaintiff undertook to do in three weeks; and he did it within three weeks, and he had those tents ready by the 21st of May of the same year. The order that the tents should be sent to the defendant at Lewiston was not made until in the July following. Now, when those tents were made, it was the duty of the defendant to go for them and to pay for them. When he saw fit, for his own convenience, to have those tents shipped to him at Lewiston, Me., it was just and right that the risk of the voyage from the place where they were made to the place to which they were shipped should be that of the purchaser, and not that of the man who made them. It was not a risk involved in the contract as made by the parties, and therefore when the tents were lost by fire because of this new request of the person who ordered the tents, it would have been most unjust to call upon the person who made the tents and had them ready within the three weeks, and held them there until the July following, to bear a risk which was solely the creation of the person who had ordered the tents, and therefore it was held that this man who made the tents was entitled to his pay.

But in this case, as we interpret the contract, it was that the payment on delivery was a part of the contract as made by the parties in the first place. It was not a new condition imposed by the purchaser of the intoxicating liquors at a subsequent time, but it was a part of the contract as agreed upon by the parties before the goods were shipped at all. Now, where there had been a shipment of goods, and they are placed in the care of the common carrier, ordinarily, we have said to you, the title passes then to the vendee, and the right of the vendor is simply what is termed in law a right of stoppage in transitu; that is to say, if the purchaser becomes insolvent before the goods have reached their destination, still the vendor of the goods has the right to stop those goods and to hold them for his purchase money.

*Charge of Court below.*

As a possible test of this case, we read to you what is said by Lord BLACKBURN in his Law on Contract of Sale, from which the learned counsel for the defendant read voluminously during his argument. He lays down this as a proposition: " The right of stoppage in *transitu* can be exercised only when the purchaser is insolvent or has become bankrupt." Under that head he goes on to lay down this as law: " It is very usual for a vendor to reserve to himself, by the terms of the contract of· sale, and of the contract which he makes with the carrier, a right to prevent or delay the delivery of the goods to the purchaser until some conditions are fulfilled. When this is the case, the solvency of the purchaser is beside the question. Neither he nor his representatives can have any right to take possession until the conditions are fulfilled, or are waived by the vendor. There is a good deal of difficulty at times in determining whether the conditions which the vendor has endeavored to make conditions precedent to the delivery of the possession, are or are not binding on the purchaser. On this subject something has already been said; but when the conditions are binding the case is not one of stoppage in transitu, but rather a case in which the peculiar circumstances have prevented the transitus ever commencing, as the carrier, instead of being an agent to forward from the vendor to the buyer, has agreed to be an agent to keep possession for the vendor till the conditions are fulfilled."

Gentlemen of the jury, we consider that that covers the case which is in hand, provided you find the facts which have been submitted to you.

[In addition to the cases which have been read from Pennsylvania on this subject, we will call attention to simply one, and that is the case of Henderson v. Lauck, 21 Pa. 359. In that case a man had sold to another a quantity of corn, to be paid for on delivery. The vendor delivered the corn, all of it, into the possession of the vendee; but when the last load was delivered the vendee refused payment. Then the vendor brought replevin, and one of the questions embraced in the case was whether the title to the goods had passed; and the Supreme Court, upon review, affirmed the judgment of the court below, holding that the title to the goods had not passed, as the payment of the price was a condition precedent to the

Charge of Court below.

transfer of the title.] [9] This is our belief as to the law. [It is very true that no case, which arises as this one does, has ever been decided by our Supreme Court to my knowledge; but I do conceive that all of the principles which are embraced in this case have been decided by our Supreme Court, and that they have been decided adversely to the position of the defendant.] [10] . . . . .

[Now, we leave it to you to say whether orders for intoxicating liquor were sent to Joseph Fleming within the past year, to be sent C. O. D., and whether those orders were filled with his co-action, or by his command, either expressed or implied. That is to say, it is not necessary that he should have commanded his agents to send that particular liquor; but if he gave to his agents general authority to fill orders C. O. D., and they filled those orders, that would hold him responsible as principal. Were those liquors sent to Mercer to the parties so ordering, C. O. D.? Does that mean that they were to be sent and the cash to be paid upon or before the delivery of the goods? If so, were those liquors received here by the parties, and did they pay the price? If they did, the defendant is guilty.] [11] But if any of these facts is not established beyond reasonable doubt, the defendant is not guilty, and you should acquit him.

The defendant has submitted the following requests for instructions:

1. If the jury find as a fact that the defendant has a license to sell liquors at wholesale in Allegheny county; that he received orders by mail from sundry persons in Mercer county, for a fixed amount of designated liquors to be shipped by express C. O. D., and the defendant set apart to the vendees the quantity and quality of liquor ordered, packed the same, and delivered it to one of the two express companies doing business between Pittsburgh and Mercer; that the express companies acted as common carriers, and as such delivered the liquors to the several vendees, and received their freight and charges for so carrying, and also the charges for returning the money to the vendor, then the sales were such as defendant was authorized to make under his license, and the defendant should be acquitted.

Answer: It is proper, perhaps, gentlemen of the jury, to

Charge of Court below.

qualify this request in this way: The evidence does not show that any of the orders stated explicitly that the liquors were to be sent C. O. D., by express.   The testimony, as I recall it, was that they said it should be sent C. O. D., without stating whether it should be sent by express or otherwise, and without designating what company or who should be made the carrier to bring liquors here.   That would, perhaps, be a ground for refusing the request.   But we have substantially refused the legal principle that is embraced in this request in the general charge, and we now refuse it explicitly.[12]

2. That when the vendees ordered liquors shipped to them C. O. D., designating the agency through whom the same should be shipped to them, and the same were so forwarded to them, at their expense, the sale was completed when the liquors were delivered to the common carrier, and the subsequent delivery of the liquors by the carrier to the vendee would not render the defendant liable under a penal statute, and the defendant should be acquitted.

Answer : This request is deficient in the same way.   The expression "designating the agency through whom the same should be shipped" is not warranted by the facts, any further than it might be inferred from the simple expression, C. O. D. It is not in evidence that that would necessarily imply that it was to be sent by an express company.   It could as well be sent in any other way C. O. D.   The expression means simply that it shall be sent, collect on delivery, as that has been explained by the evidence.   But the legal proposition that is embraced here has likewise been refused in the general charge, and we refuse it now explicitly.[13]

3. That under the law and the evidence, the court is of opinion the defendant should be acquitted.

Answer: This is likewise refused.   It is submitted to you to say whether this defendant is guilty.   If you find the facts as they have been submitted to you, we say to you that the sale took place in Mercer county, and that the elements of the offence are made out.[14]

The jury returned a verdict that they found the defendant guilty; and on January 21, 1889, being called for sentence, the defendant filed the following objection :

Arguments.

And now, January 21, 1889, it is objected that defendant cannot be sentenced under the act of May 13, 1887, P. L. 108, for the reason that the act of May 24, 1871, P. L. 1108, is in force in Mercer county.

By the court: Objection not sustained; exception.[16]

On the same day, the court passed judgment that the defendant pay the costs of prosecution, a fine of $500 to the commonwealth, and undergo an imprisonment in the common jail of Mercer county for the term of three months.[15] Thereupon the defendant, having obtained a special allocatur from the Supreme Court, took this appeal, assigning for error:

1-4. The admission of the commonwealth's offers.[1 to 4]

5. The refusal of the defendant's offer.[5]

6. The admission of the commonwealth's offer.[6]

7-11. The parts of the charge embraced in [ ] [7 to 11]

12-14. The answers to defendant's points.[12 to 14]

15. The sentence passed upon the defendant.[15]

16. The overruling of the defendant's objection.[16]

*Mr. George Shiras, Jr.* (with him *Mr. William S. Pier*), for the appellant:

1. The main question is, whether it is a misdemeanor for a licensed wholesale dealer to sell to residents of other counties liquors at wholesale, C. O. D., the price to be collected by the carrier on delivery. The learned trial judge, in his interpretation of the term "sale" for the purposes of this case, made one fundamental error which led to all those that we have assigned. He overlooked that in the interpretation of statutes, the intent of the legislature is to be constantly kept in view, and that a word used in a penal statute may not intend refinements attached to it in a civil contract. He applied in this prosecution of a statutory misdemeanor, one of the most technical, shadowy and uncertain of difficult rules, which had its inception and growth in the necessity of determining which of two parties should bear the loss by an accident whereby goods had perished in transit, and which is applicable only in construing contracts of sale.

2. If such an interpretation is to stand, what was intended as a wholesome and prudent police regulation may be converted into an engine of oppression. The defendant is under sentence,

not for selling liquor without license, but simply because he collected the purchase money at the time the vendee took his goods at Mercer.    The court and our adversaries conceded that the sales would have been lawful if the defendant had not attached the instruction to the carrier to collect the price on delivery to the vendees.    But the court was of opinion that the magic letters C. O. D. converted a lawful action into a grave misdemeanor.    The question is one of legislative intent.    When this is ascertained with reasonable certainty it is to be given effect to although the ordinary meaning of the letter of the statute may seem contrary to it: Howard v. Harris, 8 Allen 298.    A fortiori, this ordinary meaning ought to be followed when consistent with the intent of the legislature, rather than a technical one inconsistent with the spirit of the whole statute.

3. The spirit of the acts regulating the sale of liquors is restrictive and supervisory, not prohibitive.    We have the act of May 13, 1887, P. L. 108, in effect restricting the number and regulating the conduct of drinking places, and the act of May 24, 1887, P. L. 194, providing a revenue to the commonwealth by the imposition of a license upon all who engage in the wholesale traffic.    Speaking generally, that is about the extent to which the common law right to traffic in liquors without restraint has been curtailed by statute.    There is no duty imposed upon the dealer to refuse goods to those who live in other counties, even though the traffic may be prohibited therein.    Nor will it be doubted that the licensed vendor may ship the commodity to a vendee in a prohibitive district.    A licensed wholesale dealer may lawfully send a traveling agent into another county to solicit orders for liquor, and may ship the whiskey thus ordered into that county: Garbracht v. Commonwealth, 96 Pa. 449. This ruling was followed by the Supreme Court of Arkansas in Herron v. State, decided last January.

4. There is nothing in the act of May 24, 1887, P. L. 194, sustaining the charge of the court below as to the effect of sending the liquor C. O. D.    When the defendant at his store in Pittsburgh separated from its bulk the particular liquors ordered, marked the packages with the names and addresses of the vendees and delivered them to the common carrier, the transmutation of title was instantly completed, and the letters C. O. D. had no greater effect than to reserve to the vendor a

lien, in the nature of a pledge, for the price : Sweeting v. Turner, L. R. 7 Q. B. 310 ; Higgins v. Murray, 73 N. Y. 252. In Henderson v. Lauck, 21 Pa. 359, cited by the trial judge, a fraud had been perpetrated, the defendant having obtained the goods upon an agreement to pay for them on delivery, and then refused payment. A rule that is quite applicable to prevent fraud, may be entirely inapplicable to subject to a highly penal statute one who has acted without intent to infringe the law.

5. The court erred in sentencing the defendant under the act of May 13, 1887, P. L. 108.* That act is operative upon retail dealers only. It is aimed at the keepers of saloons and drinking places. Although the penal clause, by itself, might be broad enough to sustain the sentence, yet, construed with the rest of the act, its real meaning is that the unlicensed keeping of a drinking resort for retailing of liquors shall be punished. This indictment does not charge that offence, but simply a sale without license. The transactions proved in support of the indictment were sales of wholesale lots, and the defendant should have been sentenced accordingly. The act of May 24, 1887, regulating wholesale dealers, prescribes no penalty, and we must resort for this to prior legislation, and it is found in the act of May 24, 1871, P. L. 1108, regulating the granting of licenses in Mercer county and providing penalties for unlicensed sales.

*Mr. J. A. Stranahan* and *Mr. S. H. Miller* (with them *Mr. G. W. McBride,* District Attorney), for the commonwealth :

1. It is contended that the defendant is protected by his license in Allegheny county. If one object of the license laws is the raising of a revenue to the state, this object would be defeated by the line of argument adopted by the appellant. No license would be needed in Mercer county, or any other county in the state, except one, and this one county could ship liquors by its dealers to every other county in the state, in the manner done by the defendant in this case. By his advertisements the defendant offered to attend to all orders C. O. D., or otherwise ; a dangerous way of conducting the

---

* See Commonwealth v. Sweitzer, 129 Pa. 644, and Commonwealth v. Sellers, ante, 32.

business, as minors and men of intemperate habits can thus get all the liquor they want by writing to the defendant. The fact that the packages sent were marked " glass " or invoiced as " medicine," shows that the defendant or his employees knew his transactions were in violation of law.

2. The facts are inconsistent with the position that the sale was in Pittsburgh. The term, sale, cannot have a different meaning as applied to intoxicating liquors from the meaning it bears when applied to other articles. It is a general term and has a general meaning. The place of sale is the place of delivery, where the vendor parts with his title. If he deliver the liquor in Mercer county, that county is the place of sale : Garbracht v. Commonwealth, 96 Pa. 449 ; s. c., on a second writ of error, 1 Penny. 471. It will be seen from the evidence that when the orders were received by the defendant he selected his own carrier to transport the goods, and in so doing he made the carrier his agent to deliver them and collect the price on delivery. The property remained in him until the liquor was paid for and delivered, and the sale was thus consummated in Mercer county.

3. The defendant was rightfully sentenced under the act of May 13, 1887, P. L. 108. His Allegheny county license is no protection to him in Mercer county ; and, as to sales made therein he stands precisely as an unlicensed dealer, and is guilty of selling without license, whether he sold by the barrel, gallon, quart or drink. No such distinction as the defendant contends for has ever been made by any court in Pennsylvania. The object of the act is to prohibit any person from selling liquor in any manner or place, except when licensed to do so. Neither the title nor the penal clause discriminates between selling by wholesale and retailing. The defendant's position is as untenable as a claim that an unlicensed wholesaler could not be sentenced at all, because the act of May 24, 1887, P. L. 194, provides no punishment for him, or that an unlicensed retailer could not be punished unless he kept a house, room or place for the sale of liquor. All former laws, general or local, except special prohibitory laws, were repealed by the act of May 13, 1887.

OPINION, MR. JUSTICE GREEN :

In the case of Garbracht v. Commonwealth, 96 Pa. 449, which

was an indictment for selling liquor without license, we held that "the place of sale is the point at which goods ordered or purchased are set apart and delivered to the purchaser, or to a common carrier, who, for the purposes of delivery, represents him." In that case the order for the liquor was solicited and obtained by the defendant in the county of Mercer, but was sent to his principal, who was a liquor dealer in the county of Erie. The order was executed by the principal, who, in the county of Erie, at his place of business, separated or set apart from his general stock the liquor ordered, and delivered it to a common carrier to be forwarded to its destination in Mercer county. We decided that this was no violation of the law prohibiting sales without license, although neither the defendant, who was a traveling agent, nor his principal, held any license for the sale of liquor in Mercer county. This decision was not changed in the least upon a subsequent trial of the same defendant upon a different state of facts, as reported in 1 Penny. 471. | In the case now under consideration, the liquor was sold upon orders sent by mail by the purchasers, living in Mercer county, to the defendant, who is a wholesale liquor dealer in Allegheny county. The goods were set apart at the defendant's place of business in Allegheny county, and were there delivered to a common carrier, consigned to the purchaser at his address in Mercer county, and by the carrier transported to Mercer county, and there delivered to the purchaser, who paid the expense of transportation. Upon these facts alone, the decision of this court in the case of Garbracht, supra, is directly and distinctly applicable, and requires us to reverse the judgment of the court below, unless there are other facts in the case which distinguish it from that of Garbracht.

It is claimed, and it was so held by the court below, that, because the goods were marked C. O. D., the sale was not complete until the delivery was made, and, as that took place in Mercer county, where the defendant's license was inoperative, he was without license as to such sales, and became subject to the penalty of the criminal law. The argument by which this conclusion was reached was simply that the payment of the price was a condition precedent to the delivery, and hence there was no delivery until payment, and no title passed until delivery. The legal and criminal inference was, that the sale was made in

Mercer, and not in Allegheny. This reasoning ignores certain facts which require consideration. The orders were sent by the purchasers, in Mercer, by mail to the seller, in Allegheny, and in the orders the purchasers requested the defendant to send the goods C. O. D. The well-known meaning of such an order is that the price of the goods is to be collected by the carrier at the time of delivery. The purchaser, for his own convenience, requests the seller to send him the goods, with authority in the carrier to receive the money for them. This method of payment is the choice of the purchaser, under such an order; and it is beyond question that, so far as the purchaser is concerned, the carrier is his agent for the receipt and transmission of the money. If the seller accedes to such a request by the purchaser, he certainly authorizes the purchaser to pay the money to the carrier, and the purchaser is relieved of all liability to the seller for the price of the goods if he pays the price to the carrier. The liability for the price is transferred from the seller to the carrier; and, whether the carrier receives the price or not, at the time of delivery, he is liable to the seller for the price if he does deliver. Substantially, therefore, if the delivery is made by the carrier, and he chooses to give credit to the purchaser for the payment of the price, the transaction is complete, so far as the seller is concerned, and the purchaser may hold the goods.

Of course, if the seller were himself delivering the goods in parcels upon condition that on delivery of the last parcel the price of the whole should be paid, it would be a fraud on the seller if the purchaser, after getting all the parcels, should refuse to perform the condition upon which he obtained them, and in such circumstances the seller would be entitled to recover the goods. This was the case of Henderson v. Lauck, 21 Pa. 359. The court below, in that case, expressly charged that if the seller relied on the promise of the purchaser to pay, and delivered the goods absolutely, the right to the property was changed, although the conditions were never performed; but if he relied, not on the promise, but on actual payment at the delivery of the last load, he might reclaim the goods if the money was not paid. The case at bar is entirely different. So far as the seller is concerned, he is satisfied to take the responsibility of the carrier for the price, in place of that of the

seller. He authorizes the purchaser absolutely to pay the price to the carrier; and, if he does so, undoubtedly the purchaser is relieved of all responsibility for the price, whether the carrier ever pays it to the seller or not. But the carrier is also authorized to deliver the goods. If he does so, and receives the price, he is of course liable for it to the seller. But he is equally liable for the price if he chooses to deliver the goods without receiving the price. It cannot be questioned that the purchaser would be liable also; but, as he had received the goods from one who was authorized to deliver them, his right to hold them even as against the seller is undoubted. In other words, the direction embodied in the letters C. O. D., placed upon a package committed to a carrier, is an order to the carrier to collect the money for the package at the time of its delivery. It is a part of the undertaking of the carrier with the consignor, a violation of which imposes upon the carrier the obligation to pay the price of the article delivered, to the consignor. We have been referred to no authority, and have been unable to discover any, for the proposition that in such a case, after actual, absolute delivery to the purchaser by the carrier, without payment of the price, the seller could reclaim the goods from the purchaser as upon violation of a condition precedent.

If, now, we pause to consider the actual contract relation between the seller and purchaser, where the purchaser orders the goods to be sent to him C. O. D., the matter becomes still more clear. Upon such an order, if it is accepted by the seller, it becomes the duty of the seller to deliver the goods to the carrier, with instruction to the carrier to collect the price at the time of delivery to the purchaser. In such a case it is the duty of the purchaser to receive the goods from the carrier, and, at the time of receiving them, to pay the price to the carrier. This is the whole of the contract, so far as the seller and the purchaser are concerned. It is at once apparent that when the seller has delivered the goods to the carrier, with the instruction to collect the price on delivery to the purchaser, he has performed his whole duty under the contract; he has nothing more to do. If the purchaser fail to perform his part of the contract, the seller's right of action is complete; and he may recover the price of the goods from the purchaser, whether

the purchaser takes, or refuses to take, the goods from the carrier. Hence it follows that the passage of the title to the purchaser is not essential to the legal completeness of the contract of sale. It is, in fact, no more than the ordinary case of a contract of sale, wherein the seller tenders delivery at the time and place of delivery agreed upon, but the purchaser refuses performance. In such case it is perfectly familiar law that the purchaser is legally liable to pay the price of the goods, although, in point of fact, he has never had them. The order to pay on delivery is merely a superadded term of the contract; but it is a term to be performed by the purchaser, and has no other effect upon the contract than any other term affecting the factum of delivery. It must be performed, but performed by the purchaser, just as the obligation to receive the goods at a particular time or a particular place. Its nonperformance is a breach by the purchaser, and not by the seller, and therefore cannot affect the right of the seller to regard the contract of sale as complete, and completely performed on his part, without any regard to the question whether the title to the goods has passed to the purchaser as upon an actual reception of the goods by him. If this be so, the case of the commonwealth falls to the ground, even upon the most critical consideration of the contract between the parties, regarded as a contract for civil purposes only.

The duties which lie intermediate between those of the seller and those of the purchaser are those only which pertain to, and are to be performed by, the carrier. These, as we have before seen, are the ordinary duties of carriage and delivery, with the additional duty of receiving the price from the purchaser, and transmitting it to the seller. The only decided case to which we have been referred which presents the effect of an order C. O. D. to a carrier, is Higgins v. Murray, 73 N. Y. 252. There the defendant employed the plaintiff to manufacture for him a set of circus tents. When they were finished, the plaintiff shipped them to the defendant C. O. D., and they were destroyed by fire on the route. It was held that the defendant, who was the purchaser, should bear the loss; that the plaintiff had a lien on the tents for the value of his labor and materials, and his retaining his lien by shipping them C. O. D. was not inconsistent with, and did not affect his right to enforce the

defendant's liability.   In the course of the opinion Chief Justice CHURCH said: "Suppose, in this case, that the defendant had refused to accept a delivery of the tent, his liability would have been the same, although the title was not in him.   The plaintiff had a lien upon the article for the value of his labor and materials, which was good as long as he retained possession. . . . . Retaining the lien was not inconsistent with his right to enforce the liability for which this action was brought. That liability was complete when the request to ship was made by the defendant, and was not affected by complying with the request, nor by retaining the lien the same as when the request was made.   As the article was shipped at the request of and for the benefit of the defendant, (assuming that it was done in accordance with the directions,) it follows that it was at his risk, and could not impair the right of the plaintiff to recover for the amount due him upon the performance of his contract. . . . . As before stated, the point as to who had the title is not decisive.   It may be admitted that the plaintiff retained the title as security for the debt, and yet the defendant was liable for the debt in a proper personal action."   It seems to us this reasoning is perfectly sound.   Practically, it was ruled that the effect of the order C. O. D. was simply the retention of the seller's lien, and that such retention of lien is not inconsistent with a right of recovery for the price of the article, though, in point of fact, it is not delivered to the purchaser.   In other words, the literal state of the title is not decisive of the question of liability of the purchaser, and he may be compelled to pay for the article, though he never received it into his actual possession.   The Chief Justice propounds the very question suggested heretofore, of a refusal by the purchaser to accept the article, and holds that his liability would be the same, though the title was not in him.

In Hutchinson on Carriers, at § 389, the writer thus states the position and duty of the carrier: "The carrier who accepts the goods with such instructions [C. O. D.] undertakes that they shall not be delivered unless the condition of payment be complied with, and becomes the agent of the shipper of the goods to receive such payment.   He therefore undertakes, in addition to his duties as carrier, to collect for the consignor the price of his goods."   And again, in § 390: "When the goods are so

received, the carrier is held to a strict compliance with such instructions; and, if the goods are delivered without an exaction from the consignee of the amount which the carrier is instructed to collect, he becomes liable to the consignor for it." This is certainly a correct statement of the position and liability of the carrier. He becomes subject to an added duty, that of collection; and, if he fails to perform it, he is liable to the seller for the price of the goods. We have searched in vain for any text-writer's statement, or any decision, to the effect that in such case no title passes to the purchaser. We feel well assured none such can be found. But, if this be so, the whole theory that the title does not pass if the money is not paid falls, and the true legal status of the parties results, that the seller has a remedy for the price of his goods against the carrier. In other words, an order from a seller to a carrier to collect on delivery, accepted by the carrier, creates a contract between the seller and the carrier, for a breach of which by the carrier the seller may recover the price from him. So far as the seller and purchaser are concerned, the latter is liable, whether he takes the goods from the carrier or not, and the order itself is a mere provision for the retention of the seller's lien. While, if the goods are not delivered to the purchaser by the carrier, the title does not pass, that circumstance does not affect the character of the transaction as a sale; and the right of the seller to recover the price from the purchaser, if he refuse to take them, is as complete as if he had taken them, and not paid for them.

Thus far we have regarded the transaction between the parties in its aspect as a civil contract only; but, when viewed in its aspect as the source of a criminal prosecution, the transaction becomes much more clear of doubt. It is manifest, that when the purchaser ordered the goods to be sent to him C. O. D., he constituted the carrier his agent, both to receive the goods from the seller, and to transmit the price to the seller. When, therefore, the goods were delivered to the carrier at Pittsburgh for the purpose of transportation, the duty of the seller was performed, as we have already seen, so far as he and the purchaser were concerned, and as between them the transaction was complete. The duty of transportation devolved upon the carrier, and for this he was, in one sense, the agent of the

seller, as well as of the purchaser; but, as it was to be at the expense of the purchaser, the delivery to the carrier was a delivery to the purchaser; and this was ruled in Garbracht's case. The injunction to the carrier to collect the money on delivery imposed an additional duty on the carrier, which the carrier was, of course, bound to discharge. This arrangement was a matter of convenience, both to the purchaser and the seller, relative to the payment and transmission of the price; but that is all. To convert this entirely innocent and purely civil convention respecting the mode of collecting the price of the goods, into a crime, is in our judgment, a grave perversion of the criminal law, to which we cannot assent. As a matter of course, there is an utter absence of any criminal intent in the case. The defendant had a license. The sale was made at his place of business, and both the sale and delivery were completed within the territory covered by the license. If, now, a criminal character is to be given to the transaction, it must be done by means of a technical inference that the title did not pass until the money was paid; and thus that the place of sale, which in point of fact was in Allegheny county, was changed to Mercer county, where no sale was made. Even granting that, in order to conserve the vendor's lien, such a technical inference would be justified for the purposes of a civil contract, it by no means follows that the plain facts of the case must be clothed with a criminal consequence on that account. So far as the criminal law is concerned, it is only an actual sale without license that is prohibited. But there was no such sale, because all the essential facts which constituted the sale transpired in Allegheny county where the defendant's license was operative. The carrier, being the agent of the purchaser to receive the goods, does receive them from the seller in Allegheny county, and the delivery to him for the purpose of transportation was a delivery to the purchaser. This is the legal, and certainly the common, understanding of a sale. The statute, being criminal, must be strictly construed; and only those acts which are plainly within its meaning, according to the common understanding of men, can be regarded as prohibited criminal acts. We cannot consider, therefore, that a mere undertaking on the part of the carrier to collect the price of the goods at the time of his delivery to the purchaser, though

the payment of the price be a condition of the delivery, can suffice to convert the seller's delivery to the carrier for transportation and collection into a crime. We therefore hold that the sales made by the defendant upon orders C. O. D. received from the purchasers, were not in violation of the criminal statute against sales without license, and the conviction and sentence in the court below must be set aside.

> The judgment of the Court of Quarter Sessions is reversed, and the defendant is discharged from his recognizance upon this indictment.

OPINION DISSENTING, MR. JUSTICE WILLIAMS:

At the license term of the Court of Quarter Sessions for the county of Mercer in 1888, all applications from the borough of Mercer were refused. Within a few days after such refusal, the defendant, who holds a license authorizing sales by the quart and larger measure in the city of Pittsburgh, went to Mercer, and gave public notice through the local papers, and by circulars distributed from house to house, that he would supply the people of that region with liquors by the quart and upwards by express, C. O. D. A trade sprang up at once, which soon reached such dimensions as to attract public notice. The constable of Mercer returned the defendant as engaged in the sale of liquors in his borough without a license. He was indicted by the grand jury, tried, convicted, and sentenced. He comes now into this court asking to be relieved from the conviction and sentence, alleging that his sales made in Mercer, C. O. D., were lawfully made under his license in Allegheny county, and that the action of the authorities of Mercer county was an unlawful interference with a legitimate business enterprise. If this is true, whatever we may think of his business methods, we ought to relieve him from an improper conviction. If it is not true, the circumstances under which these sales were made, and the evident purpose to disregard public sentiment and the action of the court upon the subject of licenses, are reasons why the sentence should be rigidly enforced. Let us inquire, therefore, what the license granted by the courts of Allegheny county authorized him to do.

His application was for license to sell by the quart and larger measure at a place named by him in the city of Pittsburgh.

When the application was granted, it authorized him to sell at the place named and by the measure indicated in his petition, subject to all the limitations and restrictions imposed by law upon the traffic in intoxicating liquors. It did not authorize him to sell at any other place, or in any other manner. He has no right to sell and deliver liquor by the quart to a minor or a lunatic, or to one visibly affected by drink. He need not ask whether the customer who presents himself at his store lives in Allegheny county; but he is bound to take notice of his condition, if the liquor for which he applies is to be delivered into his hands at the time of sale. Such sales are in no sense sales at wholesale or to the trade, but they are sales at retail for individual consumption. The defendant could lawfully sell to the trade or to individual customers, and make delivery at the time, or through a common carrier, subject to the restrictions to which we have referred, but his sales must be made at his store.

This will be rendered more apparent if we glance at the provisions of the license law. It is well settled that a license is a personal privilege, granted in part, at least, in view of the fitness of the applicant to be intrusted with it. He is required to be a citizen. He must be a man of temperate habits, that his business may have sober and intelligent supervision. He must be a man of good moral character, affording thereby assurance that his sales shall be conducted with good faith towards the law and the public. The possession of these qualifications must be certified to by not less than twelve of his neighbors. He must give notice of his application, so that the fact may be known, and an opportunity offered for any one to object who may desire to do so. He must give a bond in the sum of $2,000, with two sufficient sureties, conditioned that he will faithfully observe all the requirements of the liquor laws. In addition to these personal qualifications, he must have a place of business. This must be rated and returned in the same manner that merchants are rated and returned for mercantile taxes; and, when his license is granted, it must be framed under glass, and conspicuously displayed in his place of business, before he begins to make sales. The purpose of these provisions is evident. It is to grant licenses only to suitable persons, to conduct business at suitable places, and to

secure an honest compliance with the laws. If, notwithstanding all this precaution, the dealer sells to persons of a prohibited class, or on prohibited days, or at any other place than that named in his license, penalties are provided by way of punishment, and, his unfitness to be trusted being thus made apparent, his license may be revoked. It is very clear that the defendant's license could not authorize him to sell and deliver by the quart or gallon to minors, or other members of the prohibited classes, or to any person at any other place than his store in the city of Pittsburgh.

Let us now inquire what he did in Mercer county. He went there, and offered to supply the people with drink, not by opening a saloon, and delivering it over the counter or bar, but by delivering at their houses, shops, or stores by an agent to whom payment could be made, and by whom the bottles or package would be delivered. In consequence, he received orders from individuals in Mercer, put up the bottle or bottles in a package, marked it "glass" or "medicine," and sent it with the bill by the carrier, marked "C. O. D." The express company carried the package, collected the money, if it was paid promptly by the consignee, and delivered the package. What is the legal effect of such a sale? If the defendant had taken the bottles to Mercer in person, and delivered them on receipt of the price, no one could be found to doubt that his sale was made where he took his money and delivered his goods. If he had sent a clerk from his store to do the business for him in the same manner, the character of the transaction would be equally free from doubt. Instead of sending his clerk, he employed the carrier to collect the bill and deliver the package for him; and the carrier became his agent for collection and delivery as truly as his clerk would have been. The duty of the carrier, as such, ended with the transportation of the package. Its undertaking to collect the price and make delivery of the article was outside the functions of a carrier, and made it the agent or factor of the consignor for that purpose. The transaction, taken together, was, both on principle and authority, a sale and delivery at Mercer, and not at Pittsburgh.

The duty of a common carrier is to carry for all who come: Angell on Carriers, § 67; Hutchinson on Carriers, §§ 47, 48;

and his duty does not extend beyond the carriage and its necessary incidents. If he accepts for carriage a package with directions not to deliver it to the consignee except on payment of the price, he will doubtless be liable for its value if he disregards the directions, because of the contract implied from his acceptance of the package so marked. If unwilling to undertake the additional duty, the carrier has the right to decline the package. If willing to undertake it, he does so, not as a carrier, but under the direction, and as the agent, of the consignor. He transports the package as a carrier, and collects the price, and on receipt thereof makes delivery, as the vendor's agent. The title remains in the vendor until the delivery is made, and if payment is not made to the agent, the package is returned to the vendor. The rule in regard to goods sent C. O. D. is very clearly stated in Hutchinson on Carriers, § 389, as follows: " Goods are frequently sent, especially by the express carrier, with instructions not to deliver them until they are paid for. In such cases it is understood that the payment of the price and the delivery of the goods are to be concurrent acts. The carrier who accepts the goods with such instructions, undertakes that they shall not be delivered unless the condition of payment be complied with, and becomes the agent of the shipper of the goods to receive such payment. He therefore undertakes, in addition to his duties as carrier, to collect for the consignor the price of the goods."

In our own state the precise question does not seem to have arisen, but there are several cases in which the principle has been clearly recognized. In Harrington v. McShane, 2 W. 443, the owners of a steamboat received flour from the plaintiff to carry to Louisville, and to sell, and return the proceeds. The flour was transported to Louisville, sold, and the proceeds, together with all the papers and effects belonging to the boat, were burned during the return voyage in a fire that consumed the boat. An action was brought to recover the proceeds of the flour. This court held that as to the sale of the flour the defendants were the agents of the consignors; but that as to the transportation, both of the flour and the money, they were carriers, and they were accordingly liable for the loss of the money. In Taylor v. Wells, 3 W. 65, the question of the carrier's liability was raised on a somewhat different state of facts.

Flour was shipped by steamboat to a point of destination in the usual manner. The captain undertook to make sale of it, and bring back the price. The flour was carried, sold by the captain, and the money received by him. He never accounted for it. Suit was brought against the owners of the boat, but it was held that they had performed their contract as carriers, and that the sale of the flour and receipt of the money by the captain was done as the agent of the shipper. The remedy of the plaintiff was therefore against his agent, and not against the carrier. The same principle was involved in Penna. Railroad Co. v. Stern, 119 Pa. 24. The carrier undertook to obtain an acceptance of a draft for the price before the delivery of the goods, but delivered them without doing so. The carrier was held liable for the goods to the consignor, this court saying, through the present Chief Justice: " The title to the property remained in the consignors until delivery in accordance with the conditions." In State v. O'Neil (Vt.), 2 Atl. Rep. 586, it is held that " an express company carrying goods on order of the seller to deliver to purchasers C. O. D. is the agent of the seller, and title does not pass until after the performance of conditions precedent, viz., delivery and payment." The only case appearing to hold a contrary doctrine which has been brought to our attention is Higgins v. Murray, 73 N. Y. 253. In that case tents had been manufactured for, and upon the direction of, a customer; and when completed, ready for delivery, he was notified of the fact. At his direction, they were sent to him C. O. D., and were destroyed on the journey. He was held liable to the manufacturer, notwithstanding their loss on the journey, because the price should have been paid when the work was finished, and he notified of the fact. The ground of liability is thus stated by CHURCH, C. J.: " If the article had burned during the progress of construction, it is clear that no action would lie, for the reason that the contract was an entirety, and, until performed, no liability would exist. And this rule, I apprehend, would apply when the contract is to make and deliver at a particular place. . . . . But when the contract is fully performed, both as it respects the character of the article and the delivery at the place agreed upon or implied, and the defendant is notified, or if a specific time is fixed, and the contract is performed within that time, upon general prin-

ciples I am unable to perceive why the party making such a contract is not liable." This case is not authority, therefore, for the doctrine advanced by the defendant in error, but turned upon another question, viz., the right of a manufacturer to payment when he has completed the article contracted for by his customer. The rule on that subject is well stated in Ballentine v. Robinson, 46 Pa. 177: "When the manufacturer of an article ordered has completed it, and, upon notice of its completion, the buyer refuses or neglects to pay for it and take it, the maker may sue for its value, and the measure of damages is the contract price." The manufacturer does not lose his right to sue upon his contract because, at the request of his customer, he sends the goods by a carrier with instructions to collect the price; but, if his contract had been to make and deliver at a place named, the title would not pass until delivery at the place named: 1 Benj. Sales, 334. The same rule was held, in relation to sales, in The Venus, 8 Cranch 253, in which it was stated in these words: "If the thing agreed to be sold is to be sent by the vendor to the vendee, it is necessary to the perfection of the contract that it should be delivered to the purchaser or his agent." Our precise question arose in Massachusetts, in Commonwealth v. Greenfield, 121 Mass. 40. A dealer in liquors was licensed to sell in Pittsfield. He received an order for twenty dozen bottles of lager from Lee. He carried the bottles to his customer at Lee, and delivered them to him there. When indicted for the sale, he set up his license to sell at Pittsfield, and alleged that setting apart the bottles at his store in Pittsfield completed the sale, and passed the title to his customer; but the court held otherwise, saying: "The evidence, . . . . . to say the least, warranted the inference that the defendant . . . . . .did not intend to part with the title until he actually delivered the goods at Lee, according to the terms of the order. If such was the fact, the goods, while in the wagon of the seller, remained his property and at his risk, and the sale was completed at Lee, and not at Pittsfield.

Upon this brief review of authorities, we conclude that the sales made by the defendant were made at Mercer when he delivered the liquor sold, and not at his store in Pittsburgh. It remains to be considered whether there is any reason why the defendant should be relieved from the punishment provided

by law for selling liquors without a license.   Let it be conceded that he supposed he had a right to make sales in the manner he did, yet ignorance of the law excuses no man.   He was bound to know what he could, and what he could not do under his license.   It is said the liquor laws are penal, and that a man is not made a criminal without a criminal intent.   This, as applicable to an act malum in se, is true; as applicable to things that are mala prohibita, merely, it is not true.   The intent is wholly immaterial, and is never inquired after.   It is the act, no matter with what intent done, that is forbidden.   The internal revenue laws of the United States are highly penal, but the courts inquire only after the act, not after the motive or intent.   Did the defendant sell without a license?   Did he omit to put the required stamp on his goods?   Did he fail to cancel the stamps, as the law requires?   The answer to these questions settles his guilt or innocence.   The same thing is true in this case.   The law under which the defendant held his license forbade him to sell outside his place of business. The evidence shows that he made sales, not only outside of his store, but outside the county of Allegheny.   He did what the law clearly said he should not do, and he thereby subjected himself to punishment.

But, if an evil intent was necessary to justify a conviction, the evidence was abundant to submit to the jury on that question.   It showed the defendant leaving his place of business, and the county in which it was located, and seeking an opportunity to make sales and deliver his goods in the county of Mercer.   It showed that his visit followed at once upon the refusal by the court of Mercer county to grant licenses.   It showed that, through the newspapers and by circulars left at every door in the borough of Mercer, he invited orders, and promised to fill them, delivering the drink to the consumer at his house or shop or store on payment of the price and the costs of transportation.   It showed that to avoid notice, and divert attention from the character and extent of this traffic, he caused the packages, in which the bottle or bottles sent to his customers were wrapped, to be marked " medicine " or " glass."   From these facts the jury would have been justified in finding that he knew that his sales were not authorized by his Allegheny county license, and that he intended to violate

the law for the sake of the profits which the refusal of licenses in Mercer opened to him. But this was not necessary. It was enough that he sold and delivered liquors in Mercer county without a license. If these sales were made to minors, or to other members of the prohibited classes, he might be prosecuted in the same manner as though he had delivered the liquors to the minor, lunatic, or drunkard with his own hand. He is bound to know to whom he retails by the quart. The law requires it. He was granted his license upon the assurance which his certificate of temperate habits and good moral character afforded, that he would give attention to his trade and conduct it in obedience to the law. He has no right to break faith with the law, commit his business to his shipping clerk, and fill orders for liquors at retail, in small packages, for consumption by the buyers, without knowing their age, their habits, their sanity, or their condition when the sale is completed by the delivery of the bottle into their hands. Sales so made are ground for the revocation of the license held by the seller, as well as for conviction of the offence charged in the indictment in this case. For the reasons now given, I dissent from the judgment in this case.

Justices CLARK and McCOLLUM concur in this dissenting opinion.