Washington, J.,
after stating the facts of the case, delivered the opinion of the majority of the court, as follows : — The claims of Maitland, McGregor and Jones are resisted, in toto, upon an objection to the national character of the claimants. The general question affecting *these parties, will, for the present, be „ postponed, in order to dispose of particular objections which are made l to all the claims, either in whole or in part, and which will depend on the particular circumstances applying to those cases.
1. The first claim that will be considered will be that of Lenox & Maitland to the -100 casks of white lead, which, it is contended, is the property of Thomas Holloway, an acknowledged British subject, but shipped in June 1812, by William Maitland & Co. (a house established in Liverpool, and composed of William Maitland and James Lenox), to Lenox & Maitland, a house established at New York, and composed of the same parties. To establish the fact of property in Thomas Holloway, the captor relies upon the following evidence : The original bill of parcels, inclosed in a letter, under date of the 3d of July 1812, from. William Maitland & Co. to Lenox & Maitland, which is headed thus, “ Thomas Holloway bought of Thomas Walker & Co., lead merchants,” dated June 2d, 1812. In corroboration of this primd facie evidence of property in Holloway, the freight and primage of this lead is cast in the margin of the bill of lading, but not so upon the acknowledged property of Lenox & Maitland, the owners of the ship, and included in the same bill of lading ; from which circumstances, it is argued, that this article did not belong to Lenox & Maitland; since, if it did, no freight could have been charged on it, any more than upon the other parts of the cargo claimed by them. In addition to this, in a list of goods shipped *175 by William Maitland & Co. by this vessel, on account of and consigned to Lenox & Maitland, and inclosed in a letter of the 22d August 1812, from the former to the latter, by the Lady Gallatin, all the goods claimed by that house separately, and also by them and McGregor jointly, are enumerated, except this parcel of white lead. This evidence is certainly very strong to fix a hostile character on this property ; and is rendered conclusive, by the omission of Maitland, in his affidavit made under the order for further proof, to say anything in relation to the white lead, although he is very particular as to all the other property claimed by Lenox & Maitland, and by jüoh-i that house jointly Avith McGregor. This court is, *therefore, of opin-[1] ion, that the court below did right in rejecting this claim.
2. The next claim to be considered, is that of Magee & Jones to a part of the cargo on board this vessel. Magee is a citizen of the United States, settled in New York, and connected Avith Jones in a house of trade. It is urged by the captors, that the whole of this property ought to have been condemned as the sole property of Jones. The bill of lading of these goods expresses them to be shipped by McGregor & Co., unto and on account of James Magee & Co., of New York. The invoice is signed by Jones, at Manchester, in England, and describes them as goods to be shipped 'on board the Venus, and to be consigned to James Magee & Co., of Noav York ; but it does not specify on whose account and risk. In a letter from Jones to Magee, dated the 1st of July 1812, covering an invoice of these goods, he says, “ they are to be sold on joint account, or on mine, at your option.” The whole question, as to the exclusive property of Jones in these goods, is rested, by the captors, upon the above expressions giving an option to Magee to be jointly concerned or not in the shipment. The question of laAV is, in Avhom the right of property was at the time of capture ? To effect a change of property, as between seller and buyer, it is essential, that there should be a contract of sale, agreed to by both parties; and if the thing agreed to be sold, is to be sent by the vendor to the vendee, it is necessary to the perfection of the contract, that it should be delivered to the purchaser or to his agent, which the master, to many purposes, is considered to be. The only evidence of a contract, such as is now set up, appears in the affidavit of Magee, who states, that in 1810, he was in England, and agreed Avith Jones, that the' latter should ship goods on joint account, when the intercourse betAveen the two countries should be opened ; and that in consequence of this agreement, the present shipment was made. Noav, admit that such an agreement was made, yet the delivery of the goods to the master of the vessel was not for the use of Magee & Jones, any more than it was for the use of the shipper solely ; and consequently, it amounted to nothing so as to divest the property out of the shipper, *2761 UIV*M Magee should elect to take them on joint account, or *to act as J the agent of Jones. Until this election was made, the goods were at the risk of the shipper, which is conclusive as to the right of property.
8. The next claim is that of Lenox & Maitland to the ship. The facts in relation to this subject are, that James Lenox, as joint-owner, with William Maitland, of this ship, obtained, in November 1811, a register for her, which Avas granted upon his oath, that he, together with William Maitland, of the city of New York, merchant, were the only owners. At this time, Maitland Avas domiciled in Great Britain; and it is contended, that the state *176 ment that Maitland was of New York, was untrue, and subjected the vessel to forfeiture, under the act of congress of the 31st of December 1792 ; and that although no claim is interposed for the United States, still the forfeiture produced by the misconduct of Lenox, is sufficient to turn him out of court, whatever disposition may ultimately be made of the property. The rule of the prize court is correctly stated in this argument; and the only question is, whether a forfeiture did accrue to the United States. The act of congress directs, that the owner who takes the oath, in case there are more than one owner, shall, in his oath, specify the names and places of abode of such owners, and that they are citizens of the United States, if such be the fact; and if one or more of them reside abroad, as a partner or partners in a co-partnership consisting of citizens, and carrying on trade with the United States, that such is the case. The law then proceeds to declare, that if any of the matters of fact in the said oath alleged, within the knowledge of the party swearing, shall not be true, the ship shall be forfeited to the United States. It cannot be denied, that at the time this oath was taken, William Maitland was a resident merchant of Great Britain, carrying on trade with the United States ; a fact totally inconsistent with that alleged in the oath, that he was of the city of New York. It is probable, and the court is willing to believe, that this statement was innocently made, under a misconception of the real character which the foreign domicil of Maitland had impressed upon him. But still, the law required explicitness on this point, and marked the distinction between a person residing abroad, and one residing within the United States. It must be admitted, in point of law, *that the fact sworn to by Lenox was not true ; and the consequence r*277 is, a forfeiture of the ship to the United States. The claim, there- L fore, of Lenox & Maitland to this vessel must be rejected. What order shall be made as to the ultimate disposition of the property, must depend upon the opinion which this court may give in some other cases touching this subject.
The great question involved in this, and many other of the prize cases which have been argued, is, whether the property of these claimants who were settled in Great Britain, and engaged in the commerce of that country, shipped before they had a knowledge of the war, but which was captured, after the declaration of war, by an American cruizer, ought to be condemned as lawful prize.. It is contended by the captors, that as these claimants had gained a domicil in Great Britain, and continued to enjoy it, up to the time when war was declared, and when these captures were made, they must be considered as British subjects, in reference to this property, and consequently, that it may legally be seized as prize of war, in like manner as if it had belonged to real British subjects. But if not so, it is then insisted, that these claimants having, after their naturalization in the United States, returned to Great Britain, the country of their birth, and there resettled themselves, they became reintegrated British subjects, and ought to be considered by this court in the same light as if they had never emigrated. On the other side, it is argued, that American citizens settled in the country of the enemy, as these persons were, at the time war was declared, were entitled to a reasonable time to elect, after they knew of the war, to remain there, or to return to the United States ; and that, until such election was, bond fide, made, the courts of this country are bound to consider them as *177 American citizens, and their property shipped before they had an opportunity to make this election, as being protected against American capture.
There being no dispute as to the facts upon which the domicil of these claimants is asserted, the questions of law alone remain to be considered. They are two : 1st. By what means and to what extent, a national character *2* -, may be impressed upon a person, different *from that which perma- • nent allegiance gives him ? And 2d. What are the legal consequences to which this acquired character may expose him, in the event of a war taking place between the country of his residence and that of his birth, or in which he had been naturalized ?
1. The writers upon the law of nations distinguish between a temporary residence in a foreign country, for a special purpose, and a residence accompanied with an intention to make it a permanent place of abode. The latter is styled by Yattel, domicil, which he defines to be,' “a habitation fixed in any place, with an intention of always staying there.” Such a person, says this author, becomes a member of the new society, at least, as a permanent inhabitant, and is a kind of citizen of an inferior order from the native citizens ; but is, nevertheless, united and subject to the society, without participating in all its advantages. This right of domicil, he continues, is not established, unless the person makes sufficiently known his intention of fixing there, either tacitly, or by an express declaration. Yatt. p. 92, 93. Grrotius no where uses the word domicil, but he also distinguishes between those who stay in a foreign country, by the necessity of their affairs, or from any other temporary cause, and those who reside there from a permanent cause. The former he denominates strangers, and the latter, subjects ; and it will presently be seen, by a reference to the same author, what different consequences these two characters draw after them.
The doctrine of the prize courts, as well as of the courts of common law, in England, which, it was hinted, if not • asserted, in argument, had no authority of universal law to stand upon, is the same ivith what is stated by the above writers ; except that it is less general, and confines the consequences resulting from this acquired character to the property of those persons engaged in the commerce of the country in which they reside. It is decided by those courts, that whilst an Englishman, or a neutral, resides in a hostile country, he is a subject of that country, and is to be considered *2791 (even *by bis own or native country, in the former case), as having J a hostile character impressed upon him.
In deciding whether a person has obtained the right of an acquired domicil, it is not to be expected, that much, if any, assistance should bo derived from mere elementary writers on the law of nations. They can only lay down the general principles- of law ; and it becomes the duty of courts to establish rules for the proper application of those principles. The question, Avhether the person to be affected by the right of domicil had sufficiently made known his intention of fixing himself permanently in the foreign country, must dejjend upon all the circumstances of the case. If he had made no express declaration on the subject, and his secret intention is to be discovered, his acts must be attended to, as affording the most satisfactory evidence of his intention. On this ground it is, that the courts of England have decided, that a person who removes to a foreign country, settles himself there, and engages in the trade of the country, furnishes, by these acts, *178 such evidence of an intention permanently to reside there, as to stamp him with the national character of the state where he resides. In questions cn this subject, the chief point to be considered, is the animus manendi; and courts are to devise such reasonable rules of evidence as may -establish the fact of intention. If it sufficiently appear, that the intention of removing was to make a permanent settlement, or for an indefinite time, the right of domicil is acquired by a residence even of a few days. This is one of the rules of the British courts, and it appears to be perfectly reasonable. Another is, that a neutral or subject, found residing in a foreign country is presumed to be there animo manendi ; and if a state of war should bring his national character into question, it lies upon him to explain the circumstances of his residence. The Bernon, 1 Rob. 86, 102. As to some other rules of the prize courts of England, particularly those which fix a national character upon a person on the ground of constructive residence, or the peculiar nature of his trade, the court is not called upon to give an opinion at this time : because, in this case, it is admitted that the claimants had acquired a right of domicil in Great *Britain, at the time of the breaking out of the war between that country and the United States. *-
2. The next question is, what are the consequences to which this acquired domicil may legally expose the person entitled to it, in the event of a war taking place between the government under which he resides and that to which he owes a permanent allegiance ? A neutral, in his situation, if he should engage in open hostilities with the other belligerent, would be considered and treated as an enemy. A citizen of the other belligerent could not be so considered, because he could not, by any act of hostility, render himself, strictly speaking, an enemy, contrary to his permanent allegiance. But although he cannot be considered an enemy, in the strict sense of the word, yet he is deemed such, with reference to the seizure of so much of his property concerned in the trade of the enemy, as is connected with his residence. It is found adhering to the enemy. He is himself adhering to the enemy, although not criminally so, unless he engages in acts of hostility against his native country, or, probably, refuses, when required by his country, to return. The same rule, as to property engaged in the commerce of the enemy, applies to neutrals ; and for the same reason. The converse of this rule inevitably applies to the subject of a belligerent state, domiciled in a neutral country; he is deemed a neutral by both belligerents, with reference to the trade which he carries on with the adverse belligerent, and with all the rest of the world.
But this national character which a man acquires by residence, may be thrown off at pleasure, by a return to his native country, or even by turning his back on the country in which he has resided, on his -way to another. To use the language of Sir W. Scott, it is an adventitious character gained by residence, and which ceases by non-residence. It no longer adheres to the party from the moment he puts himself in motion, bond fide, to quit the country sine animo revertendi. The Indian Chief, 3 Rob. 12, 17. The reasonableness of this rule can hardly be disputed. Having once acquired a national character, by residence in a foreign country, he ought to be bound by all the consequences of it, until he has thrown it off, either by an actual return to his ^native country, or to that where he was naturalized, or r*281 by commencing his removal, bond fide, and without an intention of L *179 returning. If anything short of actual removal be admitted to work a change in the national character acquired by residence, it seems perfectly reasonable, that the evidence of a bona fide intention to remove should be such as to leave no doubt of its sincerity. Mere declarations of such an intention ought never to be relied upon, when contradicted, or, at least, rendered doubtful, by a continuance of that residence which impressed the character. They may have been made to deceive ; or, if sincerely made, they may never be executed. Even the party himself ought not to be bound by them, because he may afterwards find reason to change his determination, and ought to be permitted to do so. But when he accompanies those declarations by acts which speak a language not to be mistaken, and can hardly fail to be consummated by actual removal, the strongest evidence is afforded, which the nature of such a case can furnish. And is it not proper that the courts of a belligerent nation should deny to any person the right to use a character so equivocal, as to put it in his power to claim whichever may best suit his purpose, Avhen it is called, in question ? If his property be taken, trading with the enemy, shall he be allowed to shield it from confiscation, by alleging that he had intended to remove from the country of the enemy to his own, then neutral, and therefore, that as a neutral, the trade was lawful ? If war exist between the country of his residence and his native country, and his property be seized by the former, or by the latter, shall he be heard to say in the former case, that he was a domiciled subject of the country of the captor, and in the latter, that he was a native subject of the country of that captor also, because he had declared an intention to resume his native character ; and thus to parry the belligerent rights of both ? It is to guard against such inconsistencies, and against the frauds which such pretensions, if tolerated, would sanction, that the rule above mentioned has been adopted.
Upon what sound principle, can a distinction be framed, between the case of a neutral, and the subject of one belligerent domiciled in the country of the other, at the breaking out of the war ? The property of each, found engaged in the commerce of their adopted country, belonged to them, *2R2l *kef°re the "war, in their character of subjects of that country, so J long as they continued to retain their domicil; and when a state of war takes place between that country and any other, by which the two nations and all their subjects become enemies to each other, it follows, that the property, which was once the property of a friend, belongs now, in reference to that property, to an enemy. This doctrine of the common law and prize courts of England is founded, like that mentioned under the first head, upon national law; and it is believed to be strongly supported by reason and justice. It is laid down by Grotius, p. 563, “that all the subjects of the enemy who are such from a permanent cause, that is to say, settled in the country, are liable to the law of reprisals, whether they be natives or foreigners; but not so, if they are only trading or sojourning for a little time.” And why, it may be confidently asked, should not the property of such subjects be exposed to the law of reprisals and of war, so long as the owner retains his acquired domicil, or, in the words of Grotius, continues a permanent residence in the country of the enemy ? They were before, and continue after the war, bound, by such residence, to the society of which they are members, subject to the laws of the state, and owing a qualified allegiance *180 thereto ; they are obliged to defend it (with an exception in favor of such a subject, in relation to his native country), in return for the protection it affords them, and the privileges which the laws bestow upon them as subjects. The property of such persons, equally with that of the native subjects in their totality, is to be considered as the goods of the nation, in regard to other states. It belongs, in some sort, to the state, from the right which she has over the goods of its citizens, which make a part of the sum total of its riches, and augment its power. Yatt. 147 ; and also, lib. 1, c. 14, § 182. In reprisals, continues the same author, we seize on the property of the subject, just as we would that of the sovereign ; everything that belongs to the nation is subject to reprisals, wherever it can be seized, with the exception of a deposit entrusted to the public faith. Lib. 2, c. 18, § 344. Now, if a permanent residence constitutes the person a subject of the country where he is settled, so long as he continues to reside there, and subjects his property to the law of reprisals, as a part of the property of the *nation, p. it would seem difficult to maintain, that the same consequences would L not follow in the case of an open and public war, whether between the adopted and native countries of persons so domiciled, or between the former and any other nation.
If, then, nothing but an actual removal, or a bond fide beginning to remove, can change a national character, acquired by domicil, and if, at the time of the inception of the voyage, as well as at the time of capture, the property'belonged to such domiciled person, in his character of a subject, what is there that does, or ought, to exempt it from capture by the privateers of his native country, if, at the time of capture, he continues to reside in the country of the adverse belligerent ? It is contended, that a native o-r naturalized subject of one country, who is surprised in the country where he was domiciled, by a declaration of war, ought to have time to make his election to continue there, or to remove to the country to which he owes a permanent allegiance ; and that, until such election is made, his property ought to be protected from capture by the cruizers of the latter. This doctrine is believed to be as unfounded in reason and justice, as it clearly is in law. In the first place, it is founded, upon a presumption that the person will certainly remove, before it can possibly be known, whether he may elect to do so or not. It is said, that this presumption ought to be made, because, upon receiving information of the war, it will be his duty to return home. This position is denied. It is his duty to commit no acts of hostility against his native country, and to return to her assistance, when required to do so ; nor will any just nation, regarding the mild principles of the law of nations, require him to take arms against his native country, or refuse her permission to him to withdraw whenever he wishes to do so, unless under peculiar circumstances, which, by such removal at a critical period, might endanger the public safety. The conventional law of nations is in conformity with these principles. It is not uncommon to stipulate in treaties, that the subjects of each shall be allowed to remove with their property, or to remain unmolested. Such a stipulation does not coerce those subjects either to remove or to remain. They are left free to choose for themselves ; and when they have made their election, they claim the right of enjoying *it under the treaty; But until the election is made, r*284 their former character continues unchanged. ,
*181 Until this election is made, if his property found upon the high seas, engaged in the commerce of his adopted country, should he permitted, by the cruisers of the other billigerent, to pass free, under the notion that he may elect to remove, upon notice of the war, and should arrive safe, what is to be done, in case the owner of it should afterwards elect to remain where he is ? or, if captured and brought immediately to adjudication, it must, upon this doctrine, be acquitted until the election to remain is made known. In short, the point contended for would apply the doctrine of relation to cases where the party claiming the benefit of it may gain all, and can lose nothing. I-f he, after the capture, should find it his interest to remain where ho is domiciled, his property embarked before his election was made, is safe ; and if he finds it best to return, it is safe, of course. It is safe, whether he goes or stays. This doctrine, producing such contradictory consequences, is not only unsupported by any authority, but it would violate principles long and well established in the prize courts of England, and which ought not, without strong reasons which may render them inapplicable to this country, to be disregarded by this court. The rule there, is, that the character of property, during war cannot be changed in transitu, by any act of the party, subsequent to the capture. The rule, indeed, goes further : as to the correctness of which in its greatest extension, no opinion need now be given ; but it may safely be affirmed, that this change cannot and ought not to be effected by an election of the owner and shipper of it, made subsequent to the capture, and more especially, after a knowledge of the capture is obtained by the owner. Observe the consequences which would result from it. The capture is made and known. The owner is allowed to deliberate whether it is his interest to remain a subject of his adopted, or of his native country. If the capture be made by the former, then he elects to be a subject of that country ; if by the latter, then a subject of that. Can such a privileged situation be tolerated by either belligerent ? Can any system of law be correct, which places an individual who adheres to one belligerent, and, to the period of his election to remove, *contributes to increase her wealth, in so anomalous a situation as to be clothed with the privileges of a neutral, as to both belligerents ? This notion about a temporary state of neutrality impressed upon a subject of one of the belligerents, and the consequent exemption of his property from capture by either, until he has had notice of the war, and made his election, is altogether a novel theory, and seems, from the course of the argument, to owe its origin to a supposed hardship to which the contrary doctrine exposes him. But if the reasoning employed on this subject be correct, no such hardship can exist. For if, before the election is made, his property on the ocean is liable to capture by the cruizers of his native and deserted country, it is not only free from capture by those of his adopted country, but it is under its protection. The privilege is supposed to be equal to the disadvantage, and is therefore just. The double privilege claimed seems too unreasonable to be granted.
It will be observed, that in the foregoing opinion respecting the nature and consequences of domicil, very few cases have been referred to. It was thought best not to interrupt the chain of argument, by stopping to examine cases ; but faithfully to present the essential principles to be extracted from those which were cited at the bar, or which have otherwise come under the *182 view of the court, and which applied to the subject. With what success this has been executed, is not for me to decide. But there are two or three cases which seem to be so applicable, and at the same time, so conclusive on the great points of this question, that it may not be improper briefly to notice them. In support of the general principles, that the national character of the owner at the time of capture, must decide his right to claim, and that a subject is condemned by it, even in the courts of his native country, without time being allowed to him to elect to remove, the following cases may be referred to.
In The Boedes Lust, 5 Rob. 247, it was decided, that the property of a resident of- Demarara, shipped before hostilities of any kind bad occurred between Holland and Great Britain, but which was captured, under an embargo declared by England upon Dutch property, as preparatory to war, which ensued soon after the seizure, was, by the retroactive effect of the war, applied to property so seized, to be considered *as the property of an enemy taken in war. In this case, Sir W. Scott lays it down, *- that, where property is taken in a state of hostility, the universal practice has ever been, to hold it subject to condemnation, although the claimants may have become friends and subjects, prior to the adjudication. This case is somewhat stronger than the present, in the circumstance, that in that, the state of hostility, alleged to have existed at the time of capture, was made out, by considering the subsequent declaration of war as relating back to the time of seizure under the embargo, by which reference it was decided to be a hostile embargo, and of course, tantamount to an actual state of Avar. But this case also proves, not only that the hostile character of the property at the time of capture, establishes the legality of it, but that no future circumstance changing the hostile character of tbe claimant to that of a friend or subject, can entitle him to restitution. Whether the claimant, in this case, was a neutral or a British subject, does not appear. But if the former, it will not, it is presumed, be contended, that he is, upon the principles of national law, less to be favored in the courts of the belligerent, that a subject of that nation domiciled in the country of the adverse belligerent.
WhitehilVs Case, however, referred to frequently in Robinson’s Reports, comes fully up to the present, because he was a British subject, who had settled but a feAV days in the hostile country, but before he knew or could have known of the declaration of war; yet, as he went there with an intention to settle, this, connected Avith his residence, short as it was, fixed his national character, and identified him Avith the enemy of the country he liad so recently quitted. The want of notice, and of an opportunity to extricate himself from a situation to Avhich he had so recently and so innocently exposed himself, could not prevail to protect his property against the belligerent rights of his own country, and to save it from confiscation. There are many other strong cases upon these points, which I forbear to notice particularly, from an unAvillingness to swell this opinion already too long.
The sentence of the court is as follows : This cause came on to be heard on the transcript of the record, and was argued by counsel; on consideration whereof, it is decreed and ordered, that the sentence of *the circuit court of Massachusetts condemning the one hundred casks of white lead claimed by Lenox & Maitland be, and the same is hereby affi rmed *183 with costs. And that the sentence of the said circuit court as to the claim of Magee & Jones to twenty-one trunks of merchandise be, and the same is hereby reversed and annulled ; and that the said twenty-one trunks of merchandise be condemned to the captors ; and that the sentence of the said circuit court as to the ship Venus claimed by Lenox & Maitland be, and the same is hereby reversed ; and that the said ship Venus be condemned, the one-half thereof to the captors, the other half to the United States, under the order of the said circuit court. That the sentence of the said circuit court as to the claim of William Maitland to one-half of one hundred and fifty crates of earthenware, thirty-five cases and three casks of copper, nine pieces of cotton bagging and twenty and four-twentieths tons of coal, be, and the same is hereby reversed, and that the same be condemned to the captors ; and that the sentence of the said circuit court, as to the claim of Alexander McGregor to one-half of one hundred and ninety-eight packages of merchandise, as the joint property of himself and Lenox & Maitland, and of the claim of William Maitland for one-fourth of the same goods, and of the claim of Alexander McGregor to twenty-five pieces of cotton bagging, and five trunks of merchandise, be, and the same is hereby reversed and annulled, and that the same be condemned to the captors ; and that the said cause be remanded to the said circuit court for further proceedings to be had therein.
Johnson, J., declined giving an opinion.
Story, J.
I do not sit in this cause : but the great question involved in it, respecting the effect of domicil on national character, forms the leading point in many eases before the court. Those cases have been ably and fully argued, and I have listened, with great solicitude and attention, to the discussion. On so important a question, where a difference of opinion has been expressed on the bench, I do not feel at liberty to withdraw myself from the responsibility which the law imposes on me. The parties in the other cases have a right to my opinion ; and however painful it is, in the embarrassing * «1 *situation in which I stand, to declare it, I shall not shrink from what -■ I deem a peremptory duty. The question is not new to me : it has been repeatedly before me in the circuit court, and has been applied sometimes to relieve and sometimes to condemn the claimant. I shall not pretend to go over the grounds of argument; but content myself with declaring my entire concurrence in the opinion expressed by Judge Washington on this point.