FREDRICK RODIEK, ANCILLARY EXECUTOR OF THE WILL OF JOHANN FRIEDRICH HACKFELD, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77997. Promulgated February 11, 1936.

*Reuben D. Silliman, Esq.*, for the petitioner.

*James R. Johnston, Esq.*, and *Hugh R. Dowling, Esq.*, for the respondent.

1024

OPINION.

STERNHAGEN: Petitioner is the ancillary executor of the estate of Johann Friedrich Hackfeld, deceased, who died near Bremen, Germany, on August 27, 1932. Hackfeld was born in Germany, went to Honolulu in 1877 at the age of 21, and had his regular place of abode there until 1900. While on a visit to Bremen in 1888, he married a woman who had been born in Mexico. They went to Honolulu, and two daughters were born to them there. In 1894, Hackfeld became a citizen of Hawaii; in 1900, a citizen of the United States. Later in 1900, he and his family left Hawaii for Germany, seeking a healthier climate for his wife. He placed her in various hospitals and sanitoriums in Germany, but she did not improve. In 1905, he bought a residence in Bremen, and in 1910, a country estate nearby. Before the war, he made frequent business trips to Hawaii,

and after 1924, made two or more to the United States; but the regular place of abode of himself and family from 1905 until his death was the Bremen house.

In January 1918 the Alien Property Custodian seized his property in Hawaii, and sold it at a fixed price, alleged to be inadequate. In 1924, the seizure was judged improper by the Attorney General, and the President ordered the proceeds of the sale to be paid over to Hackfeld. Some was restored before Hackfeld's death. In 1934, a bill was introduced in the Senate to pay $3,000,000 to the estate for the injuries sustained growing out of the custodian's sale. By Senate resolution, the bill was referred to the Court of Claims for report. The executor filed a petition, and the case is now pending.

After Hackfeld's death, his ancillary executor in the United States filed an estate tax return, reporting a gross estate of $306,341.86, and a tax of $16,697.60. In determining a deficiency of $778,313.63, the Commissioner computed a gross estate of $3,874,176.65, which, by affirmative answer, he now seeks to increase by $1,017,887.87. Petitioner contends that decedent was at death a nonresident of the United States so that the tax should be imposed only on his property in the United States. The value of such assets as are covered by the determination, and by the affirmative answer, are separately stated in the findings.

Assignment (a) contests the determination of residence in Hawaii. Assignments (b), (c), and (d) complain that respondent failed to give effect to a marriage and inheritance agreement between decedent and his wife, and to the Bremen law of community property which, petitioner contends, affected all decedent's property and defeated a statutory transfer at death. If this view is correct, no tax at all is due. Assignment (e) attacks the inclusion in gross estate of $3,000,000 or any amount representing the value of the claim against the United States, now pending in the Court of Claims. Assignments (f) and (g) complain of the inclusion in gross estate of any amount representing certain securities loaned by decedent to George Rodiek. Assignments (i) and (j) complain that American bank deposits and choses in action in Hawaii are improperly included in gross estate. Assignment (k) seeks a redetermination of certain stock values, but was not pressed.

Respondent's affirmative answer demands the inclusion of property situated in Germany, England, and Switzerland. The title and value of this property is not questioned, but as an alternative to his general contentions that nothing is taxable or that only American property is taxable, petitioner contends that advances of 1,014,574.61 Reichsmarks to decedent's daughter, Mrs. Rudolphi, were not part of the gross estate in any event because under German law Hackfeld could not have enforced repayment during his life.

■ The petitioner contends that at the time of Hackfeld's death he was a nonresident citizen of the United States, and more particularly that he was resident and domiciled in Bremen, Germany; while respondent has determined and contends that Hackfeld was a resident citizen, his determination being that of residence in Honolulu, Hawaii, and his contention being broadened to the United States generally, suggesting Tenafly, New Jersey. Our findings represent our ultimate conclusion of fact from our consideration of the evidence.

The Revenue Act of 1926 provides, in section 302, for the determination of gross estate, making no distinction between that of a resident and that of a nonresident. Section 303, however, in prescribing deductions for the computation of net estate, devotes subsection (a) to residents and subsection (b) to nonresidents. Article 51 of Regulations 70 provides:

* * * the statute imposes the tax only upon the transfer of so much of the estate of a nonresident as, under the terms of the statute, had its situs in the United States.

This limitation is further recognized in articles 4, 11, 52, 55, and is in accordance with section 303 (b), providing that:

* * * net estate shall be determined—

*       *       *       *       *       *       *

(b) In the case of a nonresident, by deducting from the value of that part of his gross estate which at the time of his death is situated in the United States—

*       *       *       *       *       *       *

certain named items. It was recognized in *Burnet* v. *Brooks*, 288 U. S. 378. It was tacitly recognized recently by the Finance Committee of the Senate in its comment on section 403 of the 1934 Act, imposing the tax on all the gross estate of nonresident citizens:

These sections of the House bill amend section 303 and section 304 of the Revenue Act of 1926 and section 403 of the Revenue Act of 1932 in order that Federal estate taxes will be imposed in the case of United States citizens, irrespective of whether they are residents or non-residents, * * *. The result is that under the House bill all residents of the United States and all United States citizens, irrespective of where they reside, will be fully subject to Federal estate taxes, * * *.

Article 5, of Regulations 70, states:

A resident is one who, at the time of his death, had his domicile in the United States; * * *. All persons not residents of the United States as above defined, * * * are nonresidents.

The interpretation of resident for estate tax purposes as one domiciled in this country is not unusual.[6] In *Bowring* v. *Bowers*, 24 Fed.

[6] Restatement of Conflict of Laws, *Domicil*, § 9, p. 20; Beale, Conflict of Laws, *Domicil*, §§ 10.3, 10.4.

# 1032

(2d) 918; certiorari denied, 277 U. S. 608, the court, in distinguishing the meaning of resident as used in the income tax act from its meaning in an estate tax act, said:

\* \* \* the incidence of estate and succession taxes has historically been determined by domicile and situs, and not by the fact of actual residence.

The court quotes *Matter of Martin*, 173 App. Div. 3; 158 N. Y. S. 916:

\* \* \* in many instances there is a difference between the legal intendment of the terms "residence" and "domicile" \* \* \* but in the matter of succession and transfer taxes the theory of the action of the taxing power renders the terms synonymous.

See also *Farmers' Loan & Trust Co.* v. *United States*, 60 Fed. (2d) 618; *Guaranty Trust Co., Executor*, 25 B. T. A. 507; *L. B. Peeples*, 27 B. T. A. 879; *Samuel W. Weis*, 30 B. T. A. 478 (on review, C. C. A. 5th Cir.).

The question for determination here is that of Hackfeld's domicil at the time of his death. His citizenship as a citizen of the United States is not in dispute. Story, in his Conflict of Laws, 7th Ed., sec. 46, p. 41, says:

If a person had actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed present domicile, it is to be deemed his place of domicile, notwithstanding he may entertain a floating intention to return at some future period.

This has been quoted with approval in *Gilbert* v. *David*, 235 U. S. 561, and *Rosenberg* v. *Commissioner*, 37 Fed. (2d) 808.

In *Williamson* v. *Osenton*, 232 U. S. 619, Justice Holmes said:

The essential fact that raises a change of abode to a change of domicil is the absence of any intention to live elsewhere, Story on Conflict of Laws, § 43—or, as Mr. Dicey puts it in his admirable book, "the absence of any present intention of not residing permanently or indefinitely in" the new abode.

In *The Venus*, 12 U. S. 253, 279, the Supreme Court, said:

\* \* \* In questions on this subject, the chief point to be considered, is the *animus manendi;* \* \* \*. If it sufficiently appear, that the intention of removing was to make a permanent settlement, or for an indefinite time, the right of domicil is acquired by a residence even for a few days.

The Restatement of Conflict of Laws, § 9, defines domicil as "the place with which a person has a settled connection for certain legal purposes, either because his home is there, or because that place is assigned to him by the law." [7]

The question of domicil has been called a mixed question of law and fact, in which intention is regarded as of high importance (*Rosenberg* v. *Commissioner*, 37 Fed. (2d) 808), and conduct is no

---

[7] The subject of *domicil* is comprehensively discussed by Professor Beale in his recent admirable *Treatise on the Conflict of Laws*, (1935), ch. 2. It is not a hornbook, and to quote from it here would be unsatisfactory either as omitting or including too much.

less, and often more, significant than statement.[8]  The intention must be judged by all the circumstances by which it is made manifest.  It is not a fleeting or casual or sporadic intention which controls, but a serious conception of home.  Domicil is determinable by the law of the forum, which in this case recognizes that a person has but one domicil [9] at a given time, Restatement of Conflict of Laws, § 11, and that, as to the ordinary person who has a home, it is to be stated, not in general terms of country or state, but with particularity as to the place.  *Id.* §§ 11–13; Beale § 9.6.  As Hackfeld was such a person and not a traveler, it is necessary to determine the particular place of his home before his domicil can be stated.  Hence, an affirmative proposition such as the respondent raises in his answer and urges, that Hackfeld is domiciled in or is a resident of the United States, must be supported by evidence of the location in the United States of his alleged home; while petitioner proves domicil if he establishes the fact alleged in his petition that Hackfeld's only home was in Bremen. The Commissioner's official determination holds that Hawaii was "the actual domicil of decedent", and this the petitioner challenges, alleging in his petition that Hackfeld's home at the time of his death was in Bremen.  Thus the issue of fact as to domicil is complete, and nothing is added to it by respondent's further allegation in the answer, denied in the reply, that Hackfeld "was domiciled in, and, therefore, a resident of the United States at date of death."  The burden of proof on the whole issue is on petitioner, and from all the evidence it must be determined whether he has succeeded in establishing that in fact Hackfeld's home was in Bremen as alleged.  If so, the fact must be found; if not, the omission of the Board to make such a finding, or the making of a contrary finding, would result in sustaining the Commissioner's determination that Hackfeld was taxable as a resident citizen.

Having in mind the general considerations by which domicil is determined, and the wide variety of controversies shown by the decisions, the evidence has been appraised and the finding made that at his death Hackfeld was at home in Bremen at 115 Parkallee, as he said in his will, and that this was his domicil.  Notwithstanding that there is some evidence to the contrary, including Hackfeld's own statements, we have been unable to escape this conclusion as a matter of fact.  No other inference can be adopted with any assurance that it comports with the idea of a "settled connection"; and when we are dealing with a question of fact, it is important that the finding be dominated by a sense of reality.

[8] Beale, § 41 C, p. 253.

[9] No weight whatever may be given in this proceeding to the evidence introduced that under German law (German Civil Code § 7) "domicile may exist simultaneously in several places."

By 1932, Hackfeld had unquestionably abandoned any intention to make his home again in Hawaii. He had last lived there in 1900, and his family had never been back. His wife's health, which was the prime cause of his leaving in 1900, had not improved, his daughters had married German nationals, and his business interests were not only removed from Hawaii but under such circumstances as would not be expected to encourage his return. In 1932, Hawaii, we can believe, meant nothing more to Hackfeld, then aged 76, than an old memory. Twenty-three years of his young life had been spent there, during which he had made a fortune, helped to establish a new political system, married, and seen the early childhood of his two daughters. Now all that was completely changed; and it is hard to believe that, after a lapse of 32 years, throughout which he had lived again in the country of his birth and made many neighborhood friendships, bought a town house and a country place, while his properties and business in Hawaii had been taken from him, he retained any serious feeling that Hawaii was the home to which he must return. True, he stated as late as 1923 that he regarded Honolulu as his home, these statements being made in connection with his claims arising out of the seizure of his property by the Alien Property Custodian and on a passport application; but these mere statements were not, under the circumstances, of much weight for a legal determination of domicil. Made almost nine years before the crucial date of death, they are deprived of all force by other statements made subsequently; for whatever may be said of the truth of the later statements as to Tenafly, New Jersey, they clearly indicate an abandonment of all expectation to return to Honolulu.

This leaves only Tenafly for consideration, and this largely because in papers filed to support his property claim and in applications for a passport and renewals as late as 1930 he said that Tenafly was his "legal residence," that he was "of Tenafly," or that his "address" was Tenafly, and because his agent, his attorney, his ancillary executor, and the Attorney General had said so at one time and another. The statements of these others, made without evidence of supporting knowledge, are entitled to very little weight as proof of the fact in this proceeding. His own statements, if they were intended to convey the idea of actual residence, home or domicil, are contrary to the more impressive evidence of conduct and circumstance; but it may be doubted whether by the use of such ambiguous language he meant domicil. The ownership of a vacant lot, the piece of business involving Rodiek's home, where Hackfeld once or twice spent a weekend, fail to lend color to the establishment of a domicil in Tenafly.

It must be remembered that the determination of domicil in this proceeding is confined to the time of death, and the earlier statements

and conduct are only of significance in their relation to that determination. There are clear inconsistencies in Hackfeld's various statements, and these with their implications we have not disregarded, but have undertaken to resolve. From them, Bremen appears clearly as the place of domicil.

Up to this point the consideration of the issue of domicil has been confined to the matter of fact, without regard to the collateral question whether petitioner is estopped to avail himself of it. These are two separate propositions and should not be confused. If the law insists that a taxpayer must, because of his earlier statements or conduct, which are at variance with fact, accept liabilities or forego rights which the true fact does not require, clear thinking must recognize the fact and not permit it to be distorted by the greater importance ascribed to the taxpayer's inconsistent representations. Because, in the interest of justice, the fact may be treated as overshadowed by the collateral circumstances, there is no reason for treating the fact as obliterated or refusing to recognize it. Hence, we have examined the evidence first to ascertain and determine the fact of domicil, before considering whether the petitioner is estopped to have his tax determined in accordance with it, under the nonresident provisions of the revenue act.

The Commissioner contends that, because Hackfeld, in applications to the State Department, upon which passports were issued, and in papers to support claims filed with the Alien Property Custodian, made statements which are inconsistent with the present contention of residence or domicil in Bremen, petitioner may not avail himself of such domicil—that there is an estoppel or a waiver or something akin thereto in principle, which binds petitioner by the earlier statements, either because decedent may not "benefit by his own wrong", or he may not change his position after the Government has acted on it. The date of death is the crucial time of domicil, and evidence or assertion of domicil at another time, while it may be relevant, is not necessarily inconsistent. The distinction should also be respected between domicil and citizenship, and evidence as to the latter must appear to be relevant if it is to affect the decision as to the former. Furthermore, the weight to be given to the allegedly inconsistent evidence depends upon how crucial it was in the determination of the earlier rights; for an incidental statement made in a widely different controversy could not be regarded as so misleading as to prevent the subsequent assertion of the truth.

As to the passport application, the findings are that in 1923 Hackfeld stated in his application that Honolulu was his legal residence and Bremen his temporary residence, and that he intended to return for permanent residence in the United States. The passport was issued.

Thereafter his applications of 1926, 1928, and 1930 [10] stated that his legal residence was Tenafly, New Jersey. Whether the 1923 statement was true, we need not decide; it can make no difference here as to his home at the time of death in 1932. The later statements that Tenafly was his legal residence were untrue.

The question, therefore, is whether the respondent may hold petitioner to these statements irrespective of their truth. The evidence indicates nothing more on Hackfeld's part than the filling in of the application form as to legal residence with the words, "Tenafly, New Jersey." In affidavits accompanying the applications, he made a reasonably full disclosure of the principal facts as to his movements between Hawaii, Bremen, and the United States—enough to put the State Department upon notice of the possibility that Bremen was his legal domicil. In fact, the State Department was apparently unwilling to rely upon the application, but made an investigation through one of the foreign officers, who reported that in his opinion Hackfeld was domiciled in Bremen and was not entitled to the passport applied for. The passport was nevertheless issued. This it seems to us precludes a finding that the State Department acted upon the statement made by Hackfeld in his application as to his legal residence. Even, therefore, if the misstatement as to legal residence can be regarded as a deliberate misstatement of the difficult legal concept of domicil, it can not be said to have misled the Government of the United States, when the State Department was in possession of most of the facts and in position to verify all of the evidence upon which the inference of domicil depends. *Steel* v. *Smelting Co.*, 106 U. S. 447.

Leaving aside, however, that the evidence falls short of establishing the reliance of the State Department upon the application alone, the passport itself is not conclusive, even as to citizenship, in a proceeding before a different tribunal. In his opinion as to alien property claims, the Attorney General stated that the President was not bound in the determination of Hackfeld's citizenship by the issuance of the passport, and in *Miller* v. *Sinjen*, 289 Fed. 388, it was so held. We can not find, therefore, that as a matter of fact the Government in the issuance of passports since 1923 has been misled by Hackfeld's statements upon the several applications as to his legal residence, and the omission of such a finding deprives the statements of the force of estoppel which the Commissioner would ascribe to them. This makes it unnecessary for us to consider further questions implicit in the issue of estoppel, namely, whether the Government is to be regarded as so completely unified that the statement of a citizen upon application to the State Department for a passport is to be regarded as a

---

[10] The respondent adds an application purporting to have been filed by Hackfeld in 1932; but it is unsigned and there is no evidence to authenticate it, and it must be disregarded.

potential estoppel in respect of every other relation which he may have toward the Government; and whether the issuance of a passport can in any event be regarded as an act of the United States to its damage, analogous to the giving up of money or property.

The Government's principal reliance for estoppel is upon the fact that Hackfeld procured the return of his property from the United States under the Trading With the Enemy Act, 40 Stat. 411, 460, 1020; 41 Stat. 35, 977; 42 Stat. 1511; 50 U. S. C. Ann., Appendix, by means of statements and representations which amount to an assertion of domicil in the United States. This point must be rejected, primarily because whatever may be the force of Hackfeld's statements upon the same issue in another proceeding involving domicil during and immediately after the war, they can not be projected so far beyond that time as to conclude the determination of his domicil at the time of his death in August 1932.

During the war, Hackfeld was in Bremen and prevented from leaving to attend to the large business interests which he had in Hawaii. All of the Hackfeld properties in Hawaii were seized by the Alien Property Custodian and sold. In 1923, Hackfeld, acting through an attorney and agent in this country, presented a claim to the President for the return of his property (sec. 9, Trading With the Enemy Act). Under the Trading With the Enemy Act, a resident (meaning a domiciliary, *Stadtmuller* v. *Miller*, 11 Fed. (2d) 732; *Miller* v. *Sinjen, supra*) of Germany was, irrespective of citizenship in the United States, an enemy, and no provision was made for the return to him of property seized. As to a naturalized citizen not domiciled in enemy territory, provision was made for the return of his property if he overcame the two-year presumption of expatriation, Act of March 2, 1907, 34 Stat. 1228, ch. 2534, and by section 21, amending the Trading With the Enemy Act, giving satisfactory evidence of his uninterrupted loyalty to the United States and his return or desire to return. The claim was referred by the President to the Attorney General, and after investigation by him and by the Alien Property Custodian, it was found that Hackfeld had overcome the two-year presumption of expatriation and had satisfactorily established his uninterrupted loyalty to the United States. The President thereupon allowed Hackfeld's claim and ordered the return to him of the property seized; and thereafter, presumably as rapidly as liquidation permitted, payments were from time to time made to Hackfeld until the time of his death.

The Government's point here is that, in that proceeding, Hackfeld could only prove citizenship and overcome the presumption of expatriation by proving that he was not a resident of Germany; that he did this by means of statements establishing domicil in Hawaii; that,

having procured allowance of his claim upon the basis of these statements, his estate may not now be heard to claim domicil in Bremen; and that this is likewise true of the later statements made as to his address at Tenafly. The latest of such statements appearing in the record was in June 1928, when he gave his address as care Fred Rodiek, Laurel Avenue, Tenafly, New Jersey. Since it appears from the Attorney General's opinion that an investigation was actually made in Germany by an agent of the Alien Property Custodian into Hackfeld's activities during the war, as bearing upon the subject of his loyalty, it is fair to believe that the return of property was not based solely upon the bare statements of his address at Tenafly. The subjects of investigation in that matter were Hackfeld's citizenship, residence, and deportment during the period of hostilities. Finding that at that time these were sufficient to permit the return of the property, it mattered not whether at a later time, up to the date of death, he was domiciled in the United States or elsewhere. Conceivably, an enforced residence in Bremen during the war could thereafter and prior to 1932 have become a voluntary domicil, and there is nothing in the evidence from which we can infer that such was not the case. As the petitioner has affirmatively proved that in fact Hackfeld's domicil at the time of death was in Bremen, the respondent can not be deemed to have overthrown this proof by evidence of a postoffice address in Tenafly in 1928, even though it had been relied upon by the President in acting upon the alien property claim.

It is said that the law will not permit the petitioner to benefit by his own wrong. Without attempting to narrow the force of this doctrine, we find it difficult to recognize its application in this proceeding. If the supporting statements in the alien property claim were untrue, the benefit was in the return of the property; and the determination of a correct tax liability here can not be regarded as a benefit resulting from that prior conduct. The usual application of the doctrine in tax cases is found where a taxpayer makes a statement redounding to his tax advantage in one year and later seeks to avoid the resulting burdens which his statement would impose upon him. *Stearns Co.* v. *United States*, 291 U. S. 54; *Helvering* v. *Salvage*, 297 U. S. 106. But the benefit of the return of his property which inured to Hackfeld in 1923 and 1924 under the Trading With the Enemy Act, depending as it did upon statements as to citizenship, residence and loyalty during the war, even if it grew from a wrongful statement, does not call for correction by a misapplication of the estate tax act, which is based upon his domicil in 1932. So far as this record shows, petitioner is not changing his or the decedent's position as heretofore taken in alien property proceedings, but stands upon the situation which existed at the time of death.

We therefore find no occasion for the operation of the doctrine of estoppel or any other reason to determine the estate tax liability as if Hackfeld were at the time of death a resident of the United States. We proceed upon the finding that he was domiciled in Bremen, and was therefore taxable under section 303 (b) as a nonresident citizen.

■ Immediately before his marriage, in 1888, while in Germany, Hackfeld made a marriage agreement expressly providing that all his property should be owned in community and governed by the law of Bremen relating to community property. The petitioner relies upon this contract and the respondent would for several reasons have it disregarded. We see no reason to disregard it.

Respondent makes the point that, since Hackfeld in 1888 was no longer a German subject, having lived in Hawaii more than ten years, from which, under German law, expatriation would, it is said, have been presumed, he was not in 1888 subject to the community law of Bremen. This point falls before the fact that, regardless of the nationality of the parties, the marriage agreement was made in Bremen and expressly imported the Bremen community law as controlling in regard to the husband's property. In addition to this is the recital in the agreement that the husband considered Bremen as his true domicil to which he and his bride would eventually return if his business permitted. This contract, so far as appears from the evidence, remained a valid and subsisting contract between the parties throughout their married life, and (omitting the will, which will be considered later) governed all their property at the time of the husband's death. By virtue of it, all property of the wife continued to be her separate property, and all property owned or acquired by the husband was governed by the Bremen community law. Consideration of the Bremen law of community of goods is, therefore, required, not because *ex proprio vigore* it applied to Hackfeld as a German national domiciled in Bremen, but because the parties to the contract agreed in terms to be bound by it, and it was the law of the contract.

The petitioner's argument is that the community property law of Bremen recognized and treated as the community not only the husband and wife but also the children of the marriage—the two daughters—as equal and participating members; that the community was unitary and continuing, and carried through the death of Hackfeld; that upon Hackfeld's death, there was no transfer but only his elimination from the community, leaving the interests of the surviving widow and children as they were before, and hence nothing upon which the estate tax as to him could be imposed.

The law of Bremen has been proven by means of two expert witnesses, introduced by petitioner, both of whom were qualified to testify by reason of their professional knowledge and experience as German lawyers. Their testimony was extensively given in direct

and cross-examination, and included much of their professional reasoning as to correct translation and interpretation in terms adjusted to the concepts of American law. The findings of fact represent what we regard as the essence of the foreign law governing the decision of this proceeding, after reducing all the evidence and argument to definite categorical propositions. The Bremen law of community of goods in effect in 1888 was of Germanic origin and was substantially unlike the community property law of some of our Western states which was derived from Spanish law, cf. *United States* v. *Robbins*, 269 U. S. 315; *Poe* v. *Seaborn*, 282 U. S. 101; *Goodell* v. *Koch*, 282 U. S. 118; *Hopkins* v. *Bacon*, 282 U. S. 122; *Bender* v. *Pfaff*, 282 U. S. 127. It was in 1888 apparently not found in a formulated statute or code. It was later enacted into the Bremen statute of 1899 and taken into the German Civil Code, from both of which its scope and principles are now to be gathered.

The community property was owned "at collective hands" by the two spouses and their children in undivided shares *per capita*. While the husband had the power of administration during his life, this did not include the power of disposition in derogation of the property interests of the other members of the community. During his life, the community consisted of four—the husband, wife, and two daughters—and upon his death it became three, so that all the community property which had theretofore been owned "at collective hands" by a group of four, continued to be owned by the same community, now consisting of the remaining three. See *Bek* v. *Miller*, 8 Fed. (2d) 797; *Sanchez* v. *Bowers*, 70 Fed. (2d) 715.

If Hackfeld had not made a will but had been content that the general law of community of goods imported into the marriage contract should continue to govern the effect of his death upon the community property and the resulting tax, a difficult and interesting question would have arisen as to whether there was a transfer in the statutory sense of the emergence to his survivors of a substantial economic interest as the result of his death, *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339; *Chase National Bank* v. *United States*, 278 U. S. 327; *Sanchez* v. *Bowers*, *supra*, analogous perhaps to the operation under American law of an estate by the entirety, cf. *Tyler* v. *United States*, 281 U. S. 497; *Third National Bank & Trust Co.* v. *White*, 287 U. S. 577; *Levy's Estate* v. *Commissioner*, 65 Fed. (2d) 412. But by section 6 of the marriage contract, set forth in translation in the findings, it was provided that the wife's right under Bremen law in the community property upon the husband's death was subject to his right of testamentary disposition, "which is hereby expressly reserved and which applies to half of the community property in case there is no issue from the matrimony." The effect of

the quoted clause upon the correct interpretation of the entire section is the subject of dispute between the parties here. The petitioner contends that by implication it deprived the husband of all power of testamentary disposition if at the time of death there was issue. The respondent contends that by implication if there was issue upon his death, his right of testamentary disposition was unlimited and he might dispose of the whole. There is no doubt that by section 27 of the Bremen statute [11] the *per capita* share of the husband in the community property could be disposed of by him by will. Hackfeld's *per capita* share was at the time of his death one fourth. The proper construction is, in our opinion, that the last clause of section 6, as translated, operated merely as a reassuring illustration of the limited extent of the husband's reserved right of testamentary disposition. It was as much as to say that the reservation extended of course only to his *per capita* interest, and that such *per capita* interest, in case there were no children (as naturally was the situation at the time the agreement was made), was one half. Such an illustrative clause may seem to be supererogatory, in the light of section 27 of the Bremen statute of 1899; but the law was not so clearly formulated in 1888, and there was more reason to include such an illustrative clause than there would have been if a written statute, such as section 27, had been extant. Thus, both by the Bremen law and by the contract, Hackfeld clearly had at his death no less than a *per capita* or one-fourth undivided share in the community property over which he had full power of testamentary transfer, although without a will his share would have continued to be embodied in the community property.

A few days before his death, Hackfeld made a will. In it, he adverted to the marriage agreement of 1888, recognized that under it the community property law of Bremen operated at his death so as to give his widow and each daughter, as of right, a one-third community share in such property, and admonished that this be observed as underlying his will. However, he thereupon immediately proceeded in the will to dispose of the community property in a manner wholly inconsistent with the community law of Bremen. By that law, as has been seen, he had a right of testamentary disposition only over his one-fourth share. The shares in the community property (and, by the marriage agreement, all his property was community property) were undivided shares, thus leaving specific property unidentified as to ownership. By the will, however, Hackfeld, after, in section 2, devising to the widow the real property con-

[11] Sec. 27. During the matrimony, as well as in the event that there are participating descendants after the termination of the marital community of goods through the death of the wife, the husband may dispose, mortis causa, only of his per capita share participation in the community property.

sisting of the Bremen house and the Tannenhof property, disposed of the entire estate to his executors as trustees to distribute the income to the widow and daughters during their lives and continue to hold the property into the lives of his grandchildren. Numerous specific bequests were made in section 10, and by section 11 the daughters were persuaded into an acquiescence in the will by the threat of limitation to the smaller portion which they might otherwise rightfully insist upon. The will was immediately probated, and Hackfeld's estate is being administered in accordance with its terms. There has been no protest, and the will has been recognized both in Germany and the United States as governing the succession of Hackfeld's property.

The petitioner insists, however, that notwithstanding the will and its recognition by everyone concerned with it as the source of successory rights, the Bremen law of community of goods must be regarded by the United States, in determining its tax, as the controlling system which operated upon Hackfeld's community at his death; and that the effect of this is merely to remove Hackfeld from the community and leave with the community entity the same property as it had before. If this were a matter of American law upon which an American tribunal could pass with confidence in its grasp of the relation between the marriage agreement, the community property law, and the will, we would not gainsay the duty of this Board to determine for itself to which of the three the succession was properly attributable. Cf. G. C. M. 7773, C. B. IX–2 426; *George W. Burkitt Estate*, 3 B. T. A. 1158. But the effect of the petitioner's argument here is that despite his appointment as ancillary executor under the will, by virtue of which he filed the return, paid the tax he now contests, and instituted this proceeding; despite the official recognition of the effectiveness of the will in Germany, New York, and Hawaii; and despite the unquestioned acquiescence in the will by the adult daughters who are affected (the widow's long illness may explain her silence and deprive her acquiescence of any significance in this connection), this Board must nevertheless treat the will as inoperative because it prescribes a testamentary succession at variance from the succession prescribed by the Bremen community law. This we do not feel at liberty to do. By the expert testimony, it appears that the widow was by German law entitled to elect to take or not to take under the will. This, we think, implies that the will was not without legal sanction. Cf. *Smithsonian Institution* v. *Meech*, 169 U. S. 398; *Lillian M. Brinton*, 28 B. T. A. 472; *Francis J. Kelly, Executor*, 31 B. T. A. 941 (now on appeal C. C. A., 7th Cir.). How, under German law, this sanction could be worked out, we need not attempt to discover. Enough, that it has been worked out. We treat the will, therefore, as a valid exercise by Hackfeld of the power of

testamentary disposition, and we treat as his estate all of the property, namely, the entire community property, of which he made testamentary disposition.

■ By section 303 (b), the computation of the net estate of a nonresident starts with only that part of his gross estate which at the time of death is situated in the United States. This eliminates the property in England, Switzerland, and Germany, including the alleged credits against the daughter abroad growing out of advances to her made by Hackfeld during his lifetime, which respondent, by affirmative answer, seeks to add. That affirmative claim rests upon the assumption that decedent was a resident, in which case his gross estate would include his interest in all property wherever situated (section 302), and his net estate would be determined by deducting the items enumerated in section 303 (a). But the determination already made that decedent, although stipulated to be a United States citizen, was domiciled in Bremen, necessarily disposes of the affirmative demand adversely to respondent, and leaves for consideration the question of the extent of the property situated in the United States.

By his estate tax return, the petitioner purported to include in gross estate all the United States property and none of the foreign property, and to claim no deductions. This disclaimer of deductions was a correct conception of his statutory duty, since by section 303 (c)[12] his failure to include the foreign property in the return of gross estate deprived him of deductions. Furthermore, by section 303 (e),[12] the moneys of Hackfeld on deposit with Irving Trust Co. ($12,832.04), Chase National Bank ($5,411.44), and Crocker Bank ($940.91) are expressly deemed to be property not within the United States, in view of the finding from the evidence that Hackfeld was not engaged in business in the United States at the time of his death. *Burnet* v. *Brooks*, 288 U. S. 378.

Under *Burnet* v. *Brooks*, *supra*, and *City Bank Farmers Trust Co.* v. *Bowers*, 68 Fed. (2d) 909; certiorari denied, 292 U. S. 644, all the property of a nonresident, whether it be tangible or intangible, which is situated in the United States is in principle included within the gross estate, and neither the *mobilia* doctrine nor the rule of

---

[12] Sec. 303. For the purpose of the tax the value of the net estate shall be determined—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) No deduction shall be allowed in the case of a nonresident unless the executor includes in the return required to be filed under section 304 the value at the time of his death of that part of the gross estate of the nonresident not situated in the United States.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(e) The amount receivable as insurance upon the life of a nonresident decedent, and any moneys deposited with any person carrying on the banking business, by or for a nonresident decedent who was not engaged in business in the United States at the time of his death, shall not, for the purpose of this title, be deemed property within the United States.

recent decisions applicable to taxes of the states of the Union, (*Farmers Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204; *Baldwin* v. *Missouri*, 281 U. S. 586; *Beidler* v. *South Carolina Tax Commission*, 282 U. S. 1; *First National Bank of Boston, Executor* v. *Maine*, 284 U. S. 312), is controlling. Thus the stocks and bonds, valued at $527,048.51, in the custody of Irving Trust Co. in New York are clearly within the gross estate.

The securities valued at $166,750.21 in the possession of the Canadian Bank of Commerce were owned by Hackfeld, had been "loaned" to Rodiek, and had been pledged by Rodiek to the bank as collateral security for a loan. Rodiek was insolvent, and although Hackfeld had been under no obligation to the bank, his executors, in order to get the securities, voluntarily paid off Rodiek's outstanding indebtedness to the bank, amounting apparently to $135,000. The petitioner contends that in no event should the gross estate embrace more than $31,750.21, the excess value of the securities over the loan. This contention must be rejected. The securities were Hackfeld's property when he died, and since it is gross estate and not net estate we are considering, they are to be included to the full value of Hackfeld's interest. The fact that his right to possession may have been conditioned upon the bank's release of the pledge does not qualify his ownership so as to affect his gross estate. Any question as to a statutory deduction is out of the case, as we have seen, because petitioner claims no deductions, and because section 303 (c) precludes any. But none of the statutory list of deductions is applicable. If the pledge were made by Hackfeld for his own loan, it would avail his estate nothing in reduction of estate tax, *City Bank Farmers Trust Co.* v. *Bowers*, *supra*, and it must be of less avail when the pledge is voluntarily permitted by him to be made by another. Rodiek's insolvency might operate to eliminate him as a possible debtor, but does not affect Hackfeld's ownership of the securities nor impose upon him the obligation for the debt to the bank. We see no escape from the inclusion in the gross estate of $166,750.21 as the value of these securities.

The respondent, in the determination covered by the notice of deficiency, included in the decedent's gross estate several items as property owned in Hawaii at the time of death. These are assailed in vague and general averments in the petition, which are denied in the answer. The evidence upon the subject is not sufficiently definite to support findings of fact at variance with the Commissioner's determination. The petitioner argues that, as to Hackfeld, the amounts were at the time of death mere choses in action, either because they were part of the community of goods or because they were claims against corporations in the process of liquidation, the liquidator being

itself in receivership and the claims being in litigation. Whether these hypotheses upon which the argument is built are in accordance with fact can not be determined from the meager and uncertain evidence, and we are therefore in no position to consider the soundness of the argument. The Board is "confined to the facts set out in the record", *Whitney* v. *Commissioner*, 73 Fed. (2d) 589, and may not engage in academic consideration of hypothetical issues. *Ohio Clover Leaf Dairy Co.*, 8 B. T. A. 1249; 9 B. T. A. 433; affd., 34 Fed. (2d) 1022; certiorari denied, 280 U. S. 588; *Emanuel Cohen*, 20 B. T. A. 647. We, therefore, can not say that the Commissioner's determination as to these items was in error, and the determination is sustained. Indeed, the evidence as to the Liberty bonds suggests that they were property of the decedent in the United States; but upon this we stop short of a definitive finding or conclusion of law.

We hold, therefore, that the money on deposit in the Irving Trust Co., the Chase National Bank, and the Crocker Bank, the properties in England, Switzerland, and Germany, including the advances made to Mrs. Rudolphi, are all excluded from the gross estate. Properly included is the value ($527,048.51) of the stocks and bonds with the Irving Trust Co., the full value ($166,750.21) of the securities pledged with the Canadian Bank of Commerce, and the four items of $95,118.60, $29.56, $45,452.00, and $13,876.13, representing properties in Hawaii.

■ The Commissioner has determined that the gross estate should include $3,000,000 as the value at the date of death of the so-called claim in litigation now pending in the United States Court of Claims. This is palpably erroneous. The matter, which the respondent treats as a right with a determinable value at the date of death, has never been treated as a legal right or the basis of a cause of action by Hackfeld, nor has it thus far ever been so recognized. Neither in the bill introduced by Senator Copeland nor in the resolution of the Senate referring the matter to the Court of Claims for investigation and report, was it regarded as a matter of legal obligation by the United States upon which the Hackfeld estate could proceed under a claim of right, but only as a matter of sovereign grace. There is nothing in the evidence to indicate that at the date of Hackfeld's death there was either an actual or a potential cause of action, cf. *United States* v. *Safety Car Heating & Lighting Co.*, 297 U. S. 88, but on the contrary, so far as this subsequent Court of Claims proceeding is concerned, the evidence shows that it did not take shape until after the death. The Court of Claims in such a proceeding does not enter a judgment, but makes a report to the Senate. What that report may turn out to be, no one can now foretell, and even the most favorable recommendation which may be

made by that court to the Senate will be of no force to establish an enforceable legal right. The Senate will then act upon its own judgment upon a broad standard of sovereign justice, and may uncontestably refuse what the Court of Claims may recommend. If and when the United States actually makes financial compensation to the estate, the question of its effect upon any Federal tax may require consideration, cf. *Acme Land & Fur Co.*, 31 B. T. A. 582 (on review, C. C. A. 5th Cir.). But at the time of death, there was nothing in this item of $3,000,000 which can now be included in the gross estate.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*